**Darnell MACK, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 84–962.

District of Columbia Court of Appeals.

Argued April 24, 1989.
Decided Feb. 23, 1990.

W. Gary Kohlman, Washington, D.C., for appellant.

W. Mark Nebeker, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, Asst. U.S. Atty. at the time the briefs were filed, and Elizabeth Trosman, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

■ Darnell Mack appeals from his convictions of possession of P.C.P. and marijuana with intent to distribute them (PWID) in violation of D.C.Code § 33–541(a) (1988 Repl.). He contends primarily[1] that he was denied a fair trial because prejudicial hearsay and opinion testimony were brought to the attention of the jury. Mack asserts that the trial judge committed plain error in failing to prevent the reception of the damaging evidence.

He also claims that his court-appointed counsel failed to object to most of the prejudicial material, and that he was thereby denied the effective assistance of counsel in violation of the Sixth Amendment. We find no plain error but, discerning substantial potential merit in Mack's ineffective assistance claim, we remand for further proceedings.

## I

## THE TRIAL

### A. The Prosecution Case

Mack, his mother, Frances Mack, and his sister, Karen Mack, were jointly indicted for possessing PCP and marijuana with intent to distribute. The charges stemmed from the execution of a search warrant at the house in southeast Washington in which all three defendants lived. The government's evidence, if credited, tended to show that the residence was used for the distribution of PCP and marijuana on quite a substantial scale.

On February 17, 1983, at approximately 7:30 p.m., officers of the Metropolitan Police Department (MPD) executed a search warrant at 1112 2nd Street in southeast Washington. Officer Byron R. Wallace, the principal prosecution witness, had provided the information contained in the affidavit in support of the warrant,[2] and had

---

**1.** Mack also complains that the prosecutor improperly elicited evidence about his silence after his arrest and that she and a police witness attempted to place a sinister connotation on it. There is merit to this contention. *See Baggett v. United States*, 528 A.2d 444, 445 (D.C.1987); *Singleton v. United States*, 488 A.2d 1365, 1370 (D.C.1985). Indeed, the trial judge recognized the impropriety and brought it to counsel's attention. The defense, however, sought to turn the violation to its own advantage, and attempted in its cross-examination of the officer to show that he treated Mack and his mother unfairly, and in fact discriminated against them, by singling them out for arrest because they exercised their constitutional right to remain silent. In fact, this was the main theme of the mother's cross-examination of the officer, and Mack's counsel participated to a lesser extent. Mack cannot have his cake and eat it too; having participated for tactical reasons in the significant compounding of the problem, he cannot now be heard to complain of the prejudice it allegedly caused.

Mack also contends that one of the police witnesses expressed his opinion about his guilt. This contention is closely related to the hearsay question discussed at pp. 781–783, *infra*, and the two are somewhat difficult to separate. To the extent that Mack's objection to the admission of opinion evidence is viewed as being distinct from his claims with respect to the reception of hearsay, we think that much of the alleged "opinion" testimony—*e.g.*, the assertion that Mack was arrested because he lived in the house—was not so much an expression of opinion as a restatement of the evidence against him. *See Devone v. United States*, 401 A.2d 971, 973 (D.C.), *cert. denied*, 444 U.S. 876, 100 S.Ct. 160, 62 L.Ed.2d 104 (1975).

**2.** As indicated at pp. 780–782, *infra*, Officer Wallace revealed before the jury some of the information which he claimed that he had received

obtained a judge's signature on the warrant. Wallace testified that the officers knocked on the front door and announced their authority and purpose. Upon hearing activity in the house which sounded like running, they used a battering ram to force open the door. As he entered the house, Officer James R. Eisenhauer saw some people run from the living room into the kitchen and leave the house through the back door. Other officers stationed at the rear of the house promptly apprehended the fleeing individuals, who turned out to include Mack and his mother.

Officer Wallace testified that inside the apartment, there was a strong chemical odor which he associated with PCP. In the kitchen, the police recovered the following items: (1) a gallon jar of PCP, located in the refrigerator; (2) a pound of marijuana, located on a kitchen table; (3) a gas mask, found on a dresser in the kitchen; (4) a scale, found on a kitchen table; and (5) some tin foil, some of which had been cut into squares, and coin envelopes, also on a kitchen table.[3]

Darnell Mack and his mother were advised of their constitutional rights, but neither made a statement. Each was then arrested. During a search of Darnell Mack, officers recovered $2,969.00 in cash. Officer Wallace testified that a beeper was also recovered from Darnell Mack.[4] Officer Wallace explained that beepers are often used as a means of communication between participants in a drug distribution enterprise.

Karen Mack, Darnell Mack's sister, was in the house when the police arrived, but she and several others were not arrested.[5] Several days later, Karen Mack received a grand jury subpoena. Upon her arrival at the courthouse, she was questioned by Officer Wallace. She told him that she had found the drugs and paraphernalia three days before the search, that the drugs were hers, and that the police had arrested the wrong people. A few minutes later, Karen Mack denied in the presence of an Assistant United States Attorney that the drugs belonged to her. Finally, before the grand jury, Ms. Mack reverted to her original account and stated that she was a user and that she intended to smoke all of the marijuana and PCP. She testified that she was the person who had put the drugs in the refrigerator.

Detective Steven S. Finkelberg, a "narcotics expert," testified that the contraband recovered contained usable amounts of PCP and marijuana. He also expressed the opinion that the evidence recovered suggested the existence of a wholesale drug operation. The detective estimated the value of a portion of the drugs as being $4,500.

## B.  The Defense Case

Darnell Mack did not testify. The defense presented testimony, however, which contradicted the government case in many respects, and which, if credited, supported a defense of innocent presence, both for Mack and for his mother.

The mother, Frances Mack, who worked as a "bus jockey" transporting handicapped children to school, told the jury that on Valentine's Day, February 14, 1983, she noticed a strong odor coming from a blue gym bag in her kitchen. After a conversation with her daughter Karen,[6] she told the daughter to remove the contents of the gym bag from the house. A few days later, Mrs. Mack was preparing some tuna

---

prior to the search. It is largely on these revelations that Darnell Mack's appeal is predicated.

3. There was testimony that squares of tin foil are used to package PCP for sale and that the manila envelopes are used to package marijuana.

4. Officer Eisenhauer testified, however, that he listed all of the items recovered from Mack on Prosecution Exhibit 17. The beeper was not mentioned in that exhibit.

5. Officer Wallace testified that Karen Mack and the other persons present were not arrested because they did not attempt to run and because the police officers had no prior information about their complicity in drug dealing.

6. Mrs. Mack testified that her daughter told her that she (Karen) had found the bag with the drugs inside it. The prosecutor's objection to this testimony as hearsay was sustained.

in the kitchen, with the television set turned on. A group of men broke down the front door without announcing themselves or initially disclosing who they were. At first, Mrs. Mack thought that the intruders were drug dealers who had come to recover the contents of the bag. Her son, Darnell Mack, pulled her out of the kitchen door. There, several of the men pushed her face down in the mud and pointed a gun at her head. These men subsequently identified themselves as police officers and took her back into the house, where she was formally arrested. Mrs. Mack claimed that at the time of the search, the drugs and paraphernalia were in the gym bag in which they had arrived. She denied that they were spread out in the kitchen, as the officers had claimed. Mrs. Mack asserted that neither she nor any other member of her family was involved in drug trafficking.

Mrs. Mack also testified that the beeper which the police recovered had been in the possession of Darnell's friend George Archie, rather than on Darnell, and that police obtained it when "they tore George's pocket out." She related that Archie had received a call on the beeper prior to the arrival of the police. She noted that the beeper had mud on it when it was shown to her in court.

George Archie testified that he was a close friend of the Mack family, and was visiting at the Mack residence on the evening when the police broke the door down. He ran out with Mrs. Mack, and claimed to have been roughly handled by the police both outside the house and later inside.[7] Mr. Archie testified that the beeper allegedly seized from Darnell Mack in fact belonged to him and was taken from him by police. He stated that there was mud on it as a result of his being thrown to the ground with the beeper in his possession. At the conclusion of his testimony, Mr. Archie asked the judge if he could have his beeper back; the judge denied his request. Leland Core, Archie's employer, testified that a beeper similar to the one in evidence was part of Archie's equipment at work.[8]

The defense also attempted to explain the large amount of cash taken from Darnell Mack at the time of his arrest. Mack's fiancée, Sharon Davis, told the jury that she and Darnell had made plans to rent an apartment together, and that she had recently given him $800 in cash to purchase furniture; she acknowledged, however, that the apartment in question was already furnished. Mack's mother testified that she had lent her son another $500 toward the cost of the apartment. Beyond that, Mrs. Mack testified that her son occasionally worked as a vendor at the D.C. Armory, and that it was not unusual for him to be carrying large amounts of cash.

## C. The Prejudicial Testimony

Unfortunately, the legitimately admitted evidence described above was not all that came before the jury. Officer Wallace also provided hearsay testimony to the effect that Darnell Mack was a drug dealer and that the drugs and paraphernalia in the house belonged to him. His trial counsel did little or nothing to prevent this from happening.

■ The prosecutor initially requested Officer Wallace to explain what a search warrant is and how the police obtained this one.[9] She thus elicited testimony that a

---

7. Mr. Archie, who was never charged with a crime, testified that the officers threw him down, pushed his face in the mud, and made him keep it there, threatening to shoot him in the head if he looked up. He testified that Mrs. Mack received the same treatment. He also claimed that police tore the zipper in his coat and took $274.00 from him without giving him a receipt or returning the money to him. Mr. Archie acknowledged that he never went to the police station to reclaim his money, indicating that he thought it would be useless to do so without a receipt.

8. The government states in its brief that Mr. Archie "could not recall the number for the beeper," perhaps implying that he did not know what number one would have to dial to contact him. An examination of the record reveals, however, that Mr. Archie could not remember the *registration number* of the beeper.

9. We do not agree with Mack's apparent contention that the prosecutor's inquiry into this subject was so prejudicial that the trial judge committed plain error by failing to intervene on his own initiative. *See generally Ford v. United States*, 396 A.2d 191, 193–94 (D.C.1978) (evi-

judge had received information about activity at the Mack residence which was sufficient to convince him or her that there were unlawful drugs on the premises.

On cross-examination, counsel for Frances Mack took the lead in attacking the witness, but his questioning resulted in the disclosure to the jury of information disastrous to the interests of his client's son. The mother's attorney asked Officer Wallace a somewhat confusing question about the information on which the affidavit in support of the search warrant was based. The officer, however, evidently understood counsel to be inquiring about the identity of the owner of the drugs rather than of the informant. The following exchange ensued:

Q. And you don't know whether it was a man or a woman, do you?

A. I knew what it was.

Q. What was it?

A. From my information, I knew what it was.

Q. What was it?

A. What was it or who was it?

Q. What was it and who was it?

A. It was Darnell Mack.

Darnell Mack's counsel said nothing.

A few minutes later, Frances Mack's attorney asked Officer Wallace why two other persons who were in the house when the warrant was executed were not arrested. The officer obliged him:

A. To my information, they had nothing to do with the dope.

Q. So you're still hypothesizing and theorizing based on something somebody told you; is that correct?

A. Positive.

Q. And the same thing is true about Darnell Mack; isn't that correct?

A. No, it's not.

Q. Well, where is the information, other than what you say somebody told you that is not in this courtroom, that he had something to do with it?

A. Got it through a source.

Q. Now, you don't know whether that source was lying to you or not, do you?

A. The source wasn't lying.

Although the officer had now effectively vouched for the credibility of Darnell Mack's faceless accuser, there still was not a peep out of counsel.[10]

A few pages later in the transcript, things became even more explicit. Officer Wallace had just explained again that he had learned, "through my information," that Karen Mack had nothing to do with the drugs. The mother's counsel inquired as follows:

Q. Well, tell us in this wide open court what other information that you had that mama did?

A. My information that Darnell was the regulator.

Q. Uh-huh.

A. He—excuse me—distributed the drugs probably in the Southwest area. As far as Frances was concerned—

DARNELL MACK'S COUNSEL: Objection, Your Honor.

THE COURT: Objection sustained.

The objection did not come after Darnell was identified as the "regulator," or even immediately after his alleged distribution activities were described, but only at the mention of his mother. Counsel made no motion to strike, nor did he ask the judge to instruct the jury to disregard this extraordinarily prejudicial evidence.

## D. The Verdicts

At the conclusion of the trial, only Darnell Mack was found guilty of possession

---

dence admissible to explain circumstances of arrest). The trial judge sustained an objection by the mother's attorney to Officer Wallace's testimony that the identity of the informant is not disclosed in the affidavit in support of the application for a search warrant so that those whose premises are to be searched will not learn who advised the police about their activities.

10. Later, the prosecutor encouraged Officer Wallace to adduce more hearsay:

Q. Officer, other than mere presence in the kitchen [of] those drugs you seized on February 17, as to Frances Mack, was there any information that you knew of that was the basis of your decision to arrest her?

A. From my source, I understand that she lived there.

with intent to distribute. His mother was found not guilty of PWID but guilty of the lesser included offenses of simple possession of PCP and marijuana. His sister was acquitted of all charges.

## II

### PLAIN ERROR

■ Darnell Mack claims on appeal that the admission of the hearsay and opinion testimony regarding his alleged activities as the regulator of a drug sale operation and as the owner of the drugs was reversible error on the part of the trial judge. We do not agree.

Generally, "a failure to object to an offer of evidence at the time the offer is made . . . is a waiver upon appeal of any ground of complaint against its admission." E. CLEARY, MCCORMICK ON EVIDENCE § 52 at 126 (3d ed. 1984) (citations omitted). "Hearsay evidence admitted without objection may be properly considered by the trier of fact and given its full probative value." Alston v. United States, 509 A.2d 1129, 1131 n. 9 (D.C.1986) (citations omitted).

In the present case, the judge sustained the only objection to such evidence which Mack's trial counsel ever made. Accordingly, our review is for "plain error," which means that we must determine whether the trial judge erred by failing to intervene sua sponte to assure the exclusion of the hearsay. See Irick v. United States, 565 A.2d 26, 33 (D.C.1989) and authorities there cited.

■ Under our adversary system, the judge must be an impartial arbiter. Rose v. Clark, 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3105–06, 92 L.Ed.2d 460 (1986). Although he has the authority to intervene in the case where such action is necessary in the interest of justice, see Womack v. United States, 350 A.2d 381, 382–83 (D.C.1976), the development of the facts is a task primarily assigned to counsel, and the judge should exercise his power sparingly.

Greenhow v. United States, 490 A.2d 1130, 1136 (D.C.1985). Unless the reasons for intervention are compelling, a judge generally acts within his discretion when he declines to inject himself unilaterally into the controversy or to take measures which counsel have not asked him to take. See King v. United States, 550 A.2d 348, 352–53 (D.C.1988).

The trial judge attempted conscientiously both to avoid excessive intervention and to alleviate the consequences of the inaction on the part of Mack's counsel while devastating hearsay evidence was coming to the attention of the jury. The judge remarked, sua sponte, that the testimony about the informant was not properly in the case, and that Darnell Mack's counsel should have objected to it. Although most of that evidence had been admitted without objection, the judge nevertheless instructed the prosecutor not to mention in his argument to the jury what the source had told the officer.[11] Even after the judge had brought the hearsay problem to the attention of Darnell Mack's attorney, however, the attorney did not ask the court to direct the jury to disregard the evidence. He made no motion for a mistrial or for a severance. For all practical purposes, he did nothing.

Jeopardy had attached. If the court had declared a mistrial sua sponte, the double jeopardy clause of the Fifth Amendment would have barred reprosecution in the absence of a showing, most improbable here, of "manifest necessity." United States v. Perez, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824); see also Douglas v. United States, 488 A.2d 121, 126 (D.C.1985). Under these circumstances, we cannot fault the trial judge for not terminating the proceedings against Darnell Mack on his own initiative.

Especially in hindsight, which reveals how serious the problem became, we suppose that the trial judge might have called counsel to the bench when the hearsay problem first arose and cut off the disclo-

11. The judge was also troubled by testimony that suggested that an adverse inference might be drawn against Mack and his mother because they exercised their right to remain silent. On his own initiative, the judge made it clear that no such inference may be drawn.

sures about what the informant had told the officer before the record was seriously compromised. *See Smith v. United States,* 70 U.S.App.D.C. 255, 256, 105 F.2d 778, 779 (1939) (*per curiam*). The judge might also have instructed the jury to disregard the hearsay, even without a defense request for such an instruction, but this would have entailed the risk of reinforcing the impact of testimony which the jury was not supposed to consider. The judge having gone as far as he did in protecting Darnell Mack's rights *sua sponte,* we are not persuaded that he committed "plain error" by failing to go even further.

### III

### INEFFECTIVE ASSISTANCE OF COUNSEL

The standards which govern claims of ineffective assistance of counsel were articulated by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) as follows:

First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687, 104 S.Ct. at 2064. The Court stated that "[t]he benchmark for judging a claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2063.

With respect to the level of performance prong, the Court stated that "the proper standard for attorney performance is that of reasonably effective assistance," which it further defined as meaning "reasonableness under prevailing professional norms." *Id.* at 687–88, 104 S.Ct. at 2064. This reasonableness determination must be based upon the facts of the particular case, viewed as of the time of counsel's conduct, and attorneys are "strongly presumed to

have rendered adequate assistance." *Id.* at 690, 104 S.Ct. at 2065. With respect to the prejudice prong, the defendant

must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694, 104 S.Ct. at 2068. *See also White v. United States,* 484 A.2d 553, 558 (D.C.1984), applying the two-prong *Strickland* test.

■ We conclude that Mack has made a substantial showing both of deficient performance and of prejudice. For reasons described below, however, we think it appropriate to remand the case to the trial court to make a finding on each issue.

### A. Deficient Performance

Testimony by a police officer as to what someone else told him about a defendant's nefarious activities is, of course, inadmissible hearsay. *Lucas v. United States,* 522 A.2d 876, 879 (D.C.1987). In the present case, the jurors heard hearsay testimony that

1. according to a police source, the drugs in the house belonged to, or were connected with, Darnell Mack;

2. the source who provided this information was "not lying";

3. Darnell Mack was the "regulator" of a drug distribution operation; and

4. Mack distributed drugs, probably in southwest (Washington).

Mack's counsel made an unequivocal objection only to the fourth of these disclosures, although that objection might perhaps be construed as having been directed to the third as well. *See* p. 781, *supra.* The judge sustained the single objection, but no request was made that the answer be stricken, nor did trial counsel take any further steps to protect his client from the consequences of what the jury had improperly heard.

The practical effect of the admission of this hearsay was the reception of evidence not only that Darnell Mack was engaged in criminal activity generally (drug distribution), but also that he committed the particular crime for which he was on trial. Evidence of other crimes, standing alone, is devastating enough:

> the natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge.

*Thompson v. United States*, 546 A.2d 414, 418 (D.C.1988) (quoting *People v. Zackowitz*, 254 N.Y. 192, 197–98, 172 N.E. 466, 468 (1930) (Cardozo, J.)). The harm is substantially compounded where hearsay testimony which is said to be based on information from a truthful source is adduced to show that the defendant is connected to the drugs and is thus guilty of the charged crime too.

The reasons for the exclusion of the kind of evidence which the jury heard in this case hardly require elaboration. *See generally Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). If the source had testified in person, counsel for Darnell Mack would have been able to cross-examine him. Impeachment based on bias, on faulty recollection, on prior convictions of crime, or on any of a plethora of other grounds could and surely would have been attempted. By allowing the information provided by the source to go to the jury without any opportunity for confrontation, Mack's trial counsel effectively nullified his client's rights under the confrontation clause of the Sixth Amendment. Any infirmities that this source might have had as a witness could not be brought to the jury's attention. In fact, the police officer's testimony that the source was "not lying," reinforced by the intimation that a judge had issued a search warrant based on what the informant had told the police, was all that the jurors ever learned about Darnell Mack's faceless accuser.

On the record before us, it is difficult to accept the government's suggestion that "appellant's decision not to object was likely the result of a strategic decision to permit the uninterrupted cross-examination of Officer Wallace." The trial judge minced no words in telling counsel that he ought to have objected. We agree with the trial judge. On the record as it now stands, Mack has presented a strong case that counsel's representation fell below the standard of "reasonableness under prevailing professional norms."

*B. Prejudice*

In order to satisfy the "prejudice" prong of the *Strickland* test, Mack must persuade the court that there is a "reasonable probability" that, but for his trial attorney's deficient performance, the outcome of the case would have been different. He need not demonstrate, however, that it is more likely than not that it was counsel's poor showing that made the difference between conviction and acquittal. *Strickland, supra,* 466 U.S. at 693, 104 S.Ct. at 2067.

> [T]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

*Id.* at 694, 104 S.Ct. at 2068. In determining whether Mack has made the necessary showing, we must consider both the gravity of the potential injury to his interest resulting from counsel's errors and the strength of the other evidence against him.

As we have previously noted, we view as devastating the reception of the hearsay evidence about Darnell Mack's connection with the drugs in the house, and about his alleged activities as a "regulator" and drug seller. The jury heard, in effect, that a truthful informant told police that Mack, a "regulator" and "distributor," had drugs in the house where he lived and that a judge had issued a search warrant based on this information. The police went to the house, found drugs and paraphernalia, and arrested Mack and his mother. They did not

arrest several of the other people present, including Mack's sister Karen, in part because they had no information from the source that these persons were involved in unlawful activity. The record available to the jury indicated that the reliance which the police (and even the judge who issued the search warrant) placed on the information provided by the source was substantial.

Turning to the quality of the government's case without the hearsay information provided by the police source, we conclude that the evidence was not so compelling as to render the admission of the hearsay obviously harmless or to make a remand for the trial judge's views unnecessary. On the one hand, there can be no doubt that the nonhearsay evidence was sufficient to support the verdict. The proof was overwhelming that someone in the house possessed large amounts of PCP and marijuana with the intent to distribute these substances. It was also undisputed that Darnell Mack received his mail there, and he was obviously a resident rather than a casual visitor. His admitted possession of almost $3,000 in cash and the disputed evidence that a beeper was recovered from him were, at least, highly suspicious.

On the other hand, no drugs were found on Mack. Several other family members lived in the house. Additional persons were present at the time of the search. The evidence as to who possessed and owned the beeper was vigorously contested. An explanation, albeit perhaps not the most persuasive one, was provided for Mack's possession of the cash. Constructive possession cases where several people occupy the same premises can be unpredictable and difficult. *See, e.g., United States v. Holland,* 144 U.S.App.D.C. 225, 227, 445 F.2d 701, 703 (1971) (Tamm, J., concurring). Substantial as the government's case was, we cannot know how the jury would have viewed it without the incriminating hearsay.

The information that Mack was a drug dealer and "regulator" and the person associated with the drugs in the house, however, logically tied together the drugs, the paraphernalia, the cash and the beeper. A drug dealer would be likely to have a beeper and, since Darnell Mack had been described as a drug dealer, a juror could reason that the beeper recovered by the police was probably Mack's. A drug dealer would be likely to retain large amounts of cash in connection with his drug operation, so that the "innocent" explanations of the cash lose their credibility. Finally, the source's disclosure that Darnell Mack was a dealer and regulator made it more probable that the drugs in the house were his rather than someone else's. The hearsay corroborated the admissible evidence, the admissible evidence reinforced the hearsay, and Darnell Mack's prospects evaporated. He was the only defendant convicted of PWID. We think that, at least on the record before us, Mack has demonstrated a sufficient probability that the reception of the hearsay affected the outcome of his trial to warrant a remand for further proceedings.

### C. Remand

Mack has not filed a collateral attack on his conviction pursuant to D.C.Code § 23-110 (1989). *Cf. Shepard v. United States,* 533 A.2d 1278 (D.C.1987). Any assessment we could make of counsel's performance would therefore necessarily have to be based exclusively on the trial record. This court is in the best position to assess a claim of ineffective assistance of counsel where a separate motion has been filed and an appropriate record has been made. *See, e.g., Proctor v. United States,* 381 A.2d 249, 252 (D.C.1977). As the court recently explained in *United States v. Cyrus,* ──── U.S.App.D.C. ────, 890 F.2d 1245, 1246–47 (1989):

> [W]ithout a factual record, it is virtually impossible for this court to determine whether alleged episodes of substandard representation reflect the trial counsel's "informed tactical choice" or a "decision undertaken out of ignorance of the relevant law." (Citations omitted).

Given these realities, the government argues that, in the event that we find that Mack has made a sufficient showing of prejudice,

the question of deficient performance should not be resolved in appellant's favor without exploring whether the actions of appellant's trial counsel were the product of his professional judgment. In that case, a remand would be appropriate to allow the government to establish at a hearing that counsel's failures to object were reasonable tactical choices—facts that appellee has never had an opportunity to demonstrate.

■ We agree with the government. If Mack had filed a motion pursuant to § 23–110, then the prosecutor would have had the opportunity to call Mack's counsel as a witness in support of his contention that counsel made a reasonable tactical choice by not objecting to the hearsay. The government ought not to be deprived of this opportunity simply because Mack has elected to rely solely on the trial record. We should not decide the question of ineffective assistance of counsel on the basis of incomplete information because the defendant has elected to ground his motion on a truncated record, when the prosecutor has had no opportunity to submit evidence that defense counsel's decisions were based on tactical considerations.[12]

Since a remand is necessary for findings on the question whether counsel's performance was deficient, we think it prudent to secure the trial judge's findings with respect to the issue of prejudice as well. "We must ... bear in mind that our assessment of the dynamics of a trial is limited to what can be discerned from a cold record."

Irick, supra, 565 A.2d at 32. As this court recognized in Smith v. United States, 315 A.2d 163, 167 (D.C.), cert. denied, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974), the courtroom atmosphere, as well as other factors which cannot be appraised by an appellate court, may render innocuous events which may appear "viciously prejudicial when removed from their setting." Accord, Irick, supra, 565 A.2d at 32. There being no need to make an appellate determination with respect to the issue of prejudice without our having the benefit of the findings of the trial judge, we remand the record to the trial court for a hearing on Mack's contentions with respect to both prongs of the Strickland test and for appropriate findings. Cf. Davis v. United States, 564 A.2d 31 (D.C.1989) (en banc).

So ordered.

---

12. The rule in the United States Court of Appeals for this Circuit has been stated for that court by Judge Bazelon as follows:

[The] claim of ineffective assistance ... should first be presented to the district court in a motion for a new trial. In such a proceeding, evidence dehors the record may be submitted by affidavit, and when necessary the district court judge may order a hearing or otherwise allow counsel to respond. If the trial court is willing to grant the motion, this court will remand. If the motion is denied, the appeal taken therefrom will be consolidated with the appeal from the conviction and sentence. The record of any hearing held on the motion, and any documents submitted below, will become part of the record on appeal.

United States v. DeCoster, 159 U.S.App.D.C. 326, 333, 487 F.2d 1197, 1204–05 (1973); accord, Cyrus, supra, 890 at 1297. Although we have not required the filing of a motion for a new trial in order to challenge the effectiveness of trial counsel, we reiterate that justice is best served when such a motion is filed, so that this court can have the benefit of a sufficient evidentiary record and of findings by the trial court. Proctor, supra, 381 A.2d at 252; cf. Lemon v. United States, 564 A.2d 1368, 1378 n. 20 (D.C. 1989) (addressing desirability of trial court findings where defendant claims denial of right to a speedy trial). A defendant asserting that he received ineffective assistance of counsel must, of course, act with the dispatch required by Shepard v. United States, supra.