**Nathaniel S. BRUCE, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 90–CF–686, 92–CO–97.**

District of Columbia Court of Appeals.

Argued Oct. 1, 1992.

Decided Dec. 18, 1992.

---

Mark Lee Hogge, Washington, DC, appointed by this court, for appellant.

Linda L. Mullen, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before STEADMAN, SCHWELB and SULLIVAN, Associate Judges.

SCHWELB, Associate Judge:

Bruce was indicted by a grand jury for assault on a police officer with a dangerous weapon (APO),[1] assault with a dangerous weapon (ADW),[2] and possession of a firearm during the commission of a crime of violence (PFCV).[3] He was originally alleged to have committed these offenses by shooting at Corporal Joe Bruce Walker of the Prince Georges County Police Department with a pistol.[4] The prosecution committed itself to this version of events in a sworn statement filed at presentment, in police testimony at the preliminary hearing, and to some extent in testimony before the grand jury.

Before trial, the FBI tested the pistol to determine if it had been fired and conducted nitric acid "swab" tests of Bruce's hands to determine the presence or absence of gunpowder residue. In addition, the police attempted to test-fire the pistol. These tests disclosed that the pistol was inoperable and had not been fired, and that Bruce had not fired the weapon.[5] Accordingly, the prosecution abandoned its shooting theory. Instead, the government claimed at trial that Bruce had assaulted Walker by pointing an inoperable pistol at him.

In spite of this change in the government's theory, testimony was introduced through prosecution witnesses, without effective objection by Bruce's attorney, to the effect that Bruce did fire at Corporal Walker; one witness even stated that she saw the muzzle flash. Bruce's attorney failed to introduce scientific evidence to establish that Bruce had never fired the weapon. Bruce was ultimately acquitted of APO and PFCV, but the jury found him guilty of ADW.

Bruce filed a notice of appeal, and his present attorney was appointed to represent him on appeal. The new attorney then filed a collateral attack on Bruce's conviction pursuant to D.C.Code § 23–110 (1989), alleging ineffective assistance of trial counsel. The trial judge denied the motion without a hearing. She described the decision by Bruce's trial attorney not to impeach prosecution witnesses with their prior accounts as a "tactical" one.

Bruce now appeals both from his conviction and from the judge's order denying his § 23–110 motion without a hearing. He makes numerous contentions, most of which we find to be unpersuasive. We hold, however, that Bruce was entitled to an evidentiary hearing with respect to the question whether his trial attorney was constitutionally ineffective in dealing with the changes in the government's version of events. Accordingly, we remand for a hearing on Bruce's § 23–110 motion.

I

HISTORY OF THE CASE

During the early morning hours of July 21, 1989, Corporal Walker monitored a transmission over the Prince Georges County police radio describing a man with a gun.[6] Walker, who was in uniform, ar-

---

1. D.C.Code § 22–505(b) (1989).

2. D.C.Code § 22–502 (1989).

3. D.C.Code § 22–3204(b) (1989).

4. The incident took place on the District of Columbia side of Eastern Avenue, which divides Prince Georges County from the District.

5. The test results are not in the record, and we have no independent information as to how conclusive they were. According to the government's brief in this court, however, "[t]he FBI

tests revealed that the recovered gun had not been fired and that appellant had not fired the gun." We accept this unqualified concession according to its terms.

6. The prosecutor related to the court, in the absence of the jury, that according to several witnesses, Bruce had pointed his weapon at them and threatened to blow their brains out. This apparently occurred in Maryland and is the subject of a separate Maryland prosecution of Bruce. The judge was concerned that this testimony might constitute inadmissible "other crimes" evidence, see Drew v. United States, 118

rived in the area and observed a man who matched the broadcast description, and who was later identified as Bruce. Bruce began to run, and Corporal Walker drove his police car, in reverse, parallel to Bruce's escape route. According to Walker's trial testimony, Bruce pulled a handgun from his waist and pointed it at Walker. Walker ducked and fired two shots at Bruce. The bullets missed and Bruce made his escape. A K–9 officer arrived on the scene with his police dog, Prince 35. The dog soon located Bruce hiding in the bushes.

On July 21, 1989, in a sworn statement which the prosecutor presented to the court in order to establish probable cause to detain Bruce,[7] Detective Timothy A. Doughty, who had come to the crime scene and interviewed Corporal Walker, related that

> witnesses stated that the suspect fired one shot at the officer and he fired two shots in return from his service weapon.

A hearing commissioner imposed a $50,000 surety bond.

On August 3, 1989, Detective Doughty testified at the preliminary hearing that he had interviewed Corporal Walker on the scene. Doughty related that Walker had observed a chromeplated pistol in the suspect's hand and that "the suspect fired one shot at the officer. The officer returned two shots from his service revolver." Bruce was later apprehended and "positively identified by the Prince Georges County officer as being the suspect who fired at him." According to Detective Doughty, the officer who recovered Bruce's pistol sniffed it and detected the smell of cordite. This indicated that the weapon had in fact been fired. Detective Doughty disclosed that swab tests had been administered to Bruce to determine whether he had fired the pistol, but that the results of these tests had not yet come in from the FBI laboratory. Viewing the strength of the case as "not the best," the Commissioner nevertheless *found probable cause:*

> We've got a positive ID by someone who is fired at that this was the man that

fired at him and that there was pursuit of this individual. We have testimony that somebody did smell cordite....

Detective Doughty also testified before the grand jury. He stated that Bruce was "positively identified about 22 minutes after the offense by Corporal Walker as the individual who had fired the shots at him." When Doughty was asked whether it was "conclusively determined" that Bruce had shot at Walker, he responded as follows:

> No, we have sort of conflicting statements from the witness. We have two witnesses who heard three shots, police officer who heard two shots. *On the scene, Corporal Walker told me he was not fired at.* On his police tape ... apparently he had advised the dispatcher that he had been fired at. And then we have three other eye witnesses who say that the individual did fire one shot at the police cruiser.

(Emphasis added).

Detective Doughty also told the grand jury that the pistol which Bruce had thrown to the ground had been test-fired, and that it proved to be inoperable because the firing pin and spring were missing. He explained that the weapon had been recovered in two pieces after Bruce disposed of it, and that "the recovering officer didn't notice or wasn't familiar enough with this type of weapon to realize that the firing pin was missing, and so he didn't make any effort to find it." Detective Doughty thus implied that although the weapon was inoperable after the police recovered it, it may previously have been capable of firing.

Detective Doughty acknowledged before the grand jury, under oath, that Corporal Walker had admitted on the scene that Bruce had not shot at him. Nevertheless, Doughty related unequivocally, both in his affidavit at presentment and in his testimony at the preliminary hearing, that Bruce had fired at Walker. Doughty did not disclose, either at presentment or at the preliminary hearing, Walker's earlier representation that Bruce did not fire at Walker.

U.S.App.D.C. 11, 331 F.2d 85 (1964), and it was not introduced in the present case.

**7.** The sworn statement was in the part of Metropolitan Police Department Form 163, which is

known as a *"Gerstein"* proffer. *See Gerstein v. Pugh,* 420 U.S. 103, 119–25, 95 S.Ct. 854, 865–69, 43 L.Ed.2d 54 (1975).

## II

## THE TRIAL

Trial in this case was originally scheduled for December 14, 1989. On December 12, 1989, the prosecutor moved for a continuance because the FBI analysis of the pistol and of the acid swabs obtained from Bruce's hands had not yet been completed. Although Bruce, who had been unable to post bond, and who therefore remained incarcerated, apparently demurred, defense counsel agreed to the requested continuance, which the judge granted "in the interest of the defense as well as the government."

By the time the case came to trial on March 2, 1990, the FBI analysis had been completed. The tests evidently revealed, as we have indicated, see note 5, supra, that the pistol had not been fired and that Bruce had not fired the weapon. The prosecutor reported to the judge that "we're not alleging that the gun was fired at the officer." [8] She represented in her opening statement that Bruce had pointed the pistol at Corporal Walker, and that Walker "thought the defendant was going to fire right at his face." The prosecutor scrupulously adhered to this position in all of her statements throughout the trial. She also revealed to the jury in her opening statement that the pistol was not operable.

Not all of the testimony of the prosecution witnesses, however, conformed to the government's new theory. Corporal Walker testified that as he (Bruce) was running away, Bruce pointed his pistol at Walker. On cross-examination, Walker elaborated:

Q. All right. Did you think you were being shot at?

A. Yes, sir.

Q. And was your perception such that you made any sort of radio broadcast to the extent that a shot was fired at you?

A. I made a radio broadcast that shots were fired. I did not say who were they fired at. I said shots were fired, sir.

Q. Right. And did you at any time say that you were fired at?

A. I said I thought that I was fired at.

Q. No. While you were making the radio broadcast.

A. No, sir. I said shots were fired.

Following some inconclusive discussion as to who said what on the radio transmission (which was played in part to the jury), Walker testified as follows on redirect examination:

Q. You were also cross-examined about statements you have made about thinking you were fired at. Why did you think you may have been fired at?

A. Because when I got out of the car, other people said they saw the gun fire.

MR. LEWIS: Objection.

THE COURT: Sustained. [9]

The next witness, Mrs. Maxine Upshur, a geographic technician at the Department of Commerce, testified that she was sitting on her front porch on the Maryland side of Eastern Avenue. She observed the contretemps between Corporal Walker and the man later identified as Bruce. She testified that Bruce raised his hand and pointed it towards the officer's vehicle. In Mrs. Upshur's own words:

We heard a shot. And then he started running. He threw—we saw him throw something down, and then he started running, and then the policeman started firing. Well, the policeman had ducked down when he first shot, shot at the police.

After allegedly observing these events, Mrs. Upshur and her husband went over to the police officer to see if he had been hurt.

On cross-examination, Mrs. Upshur reiterated what she thought she saw:

Q. All right. So, in other words, he raised his arm and then threw, threw the object—

A. After he fired a shot.

Acknowledging that she did not see anything in the suspect's hand, Mrs. Upshur stated that "when he raised his hand we

---

**8.** The judge remarked at this point that it "might be easier to get a [jury] panel if they don't think that the police officer was shot."

**9.** There was no contemporaneous instruction to the jury to disregard the answer. Cf. Thompson v. United States, 546 A.2d 414, 425 (D.C.1988) (citation omitted).

heard the shots. So I just figured the gun was in that hand." She also claimed to have seen the muzzle "flash."

Detective Doughty, who had been the government's only witness at the prior proceedings, testified briefly. The principal purpose of his testimony was to confirm that Corporal Walker had positively identified Bruce as his assailant. Doughty was not questioned at all regarding his prior testimony.

Officer Welton A. Boomer, a crime scene search officer, described his investigation at the crime scene and thereafter. He explained that when the pistol allegedly used by Bruce was recovered, it was in two parts. When Boomer subsequently took the weapon to the Metropolitan Police Department's firearms examination section, it was found to have several missing parts, and was therefore inoperable. Officer Boomer also testified on cross-examination that swab tests had been administered to Bruce following the latter's arrest, but that he (Boomer) did not administer them. The prosecutor objected to further interrogation regarding these tests on the ground that the officer did not conduct them and that the question was "beyond the scope of the direct." The judge sustained the objection. Subsequently, on redirect examination by the prosecutor, the officer explained that the purpose of the swab tests was to detect any gunpowder residue on Bruce's hands. The presence or absence of such residue would help to establish if Bruce had fired a weapon, but would not disclose whether or not he had picked up or held one. No fingerprints were detectable on the pistol.

At the conclusion of the prosecution's case, defense counsel moved for a judgment of acquittal; the judge denied the motion. The defense then rested without introducing any evidence.

In her closing argument, the prosecutor adhered to her theory that Bruce assaulted

Corporal Walker by pointing the pistol at him. Directing her attention to the condition of the pistol, the prosecutor stated that the weapon was inoperable when the police attempted to test-fire it, and she noted in that connection that it "fell apart when it was dropped." The prosecutor continued as follows:

> One charge is assault with a dangerous weapon, and the government is alleging that the dangerous weapon here is this gun. Does the fact that it's not operable mean it wasn't dangerous? No. Because as the judge will instruct you, a dangerous weapon does not have to be used. You don't have to touch the person or hit him over the head with it. You don't have to fire it. It just has to be a weapon that the person on the other end of it has a reason, a reasonable basis to believe might be used against him.

Defense counsel stated in his closing argument that he was not contesting the evidence that Bruce had been in possession of a handgun.[10] Counsel contended, however, that the government had failed to prove that Bruce had pointed the weapon at Corporal Walker. He asked the jury "to the extent you can, analytically, [to] put aside that he might have been up to no good with that handgun, because you can't find him guilty for something that you think he might have been planning." Counsel also alluded to Mrs. Upshur's testimony that she saw "the muzzle flash from a gun that doesn't work." He suggested that this "leaves us with perhaps certain assumptions that individuals make about activity and about conduct based on things that they see or they think they see." He argued that "Corporal Walker sees the gun and he thinks the gun—he perceives that the gun is being pointed at him. So he ducks."[11]

Counsel then forcefully attacked the plausibility of the government's theory

---

**10.** Counsel also conceded that his client had fled because he had something to hide, namely, the pistol.

**11.** The prosecutor responded effectively on rebuttal:

> Defense counsel would have you believe that the officer, because he got a radio run saying

that the man was armed with a gun, had a hallucination that he pointed it at him.
This inference of a hallucination, however, is a potential double-edged sword. Arguably, the notion that Walker imagined a shooting is just as incredible as the suggestion that he "hallucinated" a pointing. If the officer did not imag-

This gun is inoperable. Who is going to point a gun at a police officer and risk getting his head blown off by the act of pointing a gun? Who is going to think that they're going to outrun a bullet even if that pointing buys them maybe three or four seconds? It's not going to be enough to get out of Dodge. It's not going to be enough to get away from the line of fire.

After again requesting the jurors to put aside their feelings about Bruce's possession of the pistol and about anything he might have planned to do with it later, counsel continued:

Did he point that handgun at Mr.—at Corporal Walker? We would suggest that circumstances say no. We know he didn't fire the gun. It couldn't fire. Swabs were taken. You didn't hear the Government say anything about the results. Nobody is saying that that gun was fired except Mrs. Upshur, because she thought it was.

At no time during the trial did Bruce's attorney challenge the credibility of Corporal Walker or of Detective Doughty on the basis of the inconsistent accounts which they had provided. Indeed, he never brought to the jury's attention in any meaningful way that the police had changed their accusation from an assault by shooting at Walker to one that consisted of pointing an inoperable pistol at him. Bruce's attorney also failed to contest the introduction of factually unsubstantiated testimony that his client had shot at a police officer. Once that evidence had been received, counsel failed to introduce undisputed and readily available evidence—namely, the results of the FBI tests—which would have effectively foreclosed the suggestion that Bruce had done so.

The jurors thus knew only that the pistol was inoperable *after it broke in two*, and that *neither side* had introduced evidence about the results of the swab tests. They were at least arguably left with the impres-

sion that Bruce may not only have pointed his pistol at Corporal Walker, but that he may have fired it at him as well—the very account provided by the prosecution's only civilian witness and reinforced by Walker's hearsay testimony about what other people told him.

### III
### THE DIRECT APPEAL

In his direct appeal, Bruce appears to make three separate allegations of trial error. First, he contends that the prosecutor's failure to correct the allegedly false testimony of government witnesses deprived him of his liberty without due process of law. Second, he claims that the evidence presented by the government at the preliminary hearing and later to the grand jury was false, and that its falsity undermined the findings of probable cause. Third, he maintains that the evidence at trial was insufficient to support his conviction. None of these contentions has merit.

*A. Due Process.*

■ A conviction obtained through the use of false evidence, known to be false by the prosecutor, denies a defendant liberty without due process of law. *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected." *Napue, supra,* 360 U.S. at 269, 79 S.Ct. at 1177; *see also Giglio, supra,* 405 U.S. at 153, 92 S.Ct. at 765. Relying on these decisions, Bruce argues that the prosecutor, knowing from the tests conducted by the FBI that Bruce did not fire a weapon, had an obligation to intervene after Mrs. Upshur testified that Bruce did in fact shoot at Corporal Walker.

■ Although it may well have been prudent on the part of the prosecutor to seek some effective action from the court [12] re-

---

ine the shooting, but nevertheless reported that one occurred (when it did not), the defense might well suggest that he lied in order to justify after the fact his own use of deadly force.

**12.** The prosecutor might, for example, have asked for leave to approach the bench and requested the judge to instruct the jury, then and there, that Bruce had not fired the weapon and

garding this evidently mistaken testimony,[13] this case is distinguishable from *Napue* and *Giglio* in a critical and, in our view, dispositive respect. In both of these cases, the prosecutor knew that the evidence was false, but the judge and defense counsel did not. Because only the prosecutor was aware of the deception, it was his obligation, and only his, to disclose it.

In the present case, on the other hand, both the defense and the court were aware that the results of the FBI tests were favorable to Bruce. Under these circumstances, it was at least arguably appropriate for the prosecutor to leave it to defense counsel to propose a way to protect the interests of his client. If the prosecutor had brought the conceded inaccuracy of the testimony to the attention of court and counsel, she would only have been telling them what they already knew.

Moreover, "although [Bruce's] complaint is primarily with the prosecutor, it is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel." *Irick v. United States*, 565 A.2d 26, 33 (D.C.1989).[14] The judge was not asked to intervene. Once she heard the problematic testimony, the judge might reasonably have called counsel to the bench and attempted to nip the problem in the bud. Nevertheless, given the various tactical options available to Bruce's attorney, see Part IV, *infra*, we are satisfied that the judge did not commit plain error by failing to intervene on her own initiative and by allowing the attorneys, in effect, to "try their own case." *See, e.g.,*

*Mack v. United States*, 570 A.2d 777, 782–83 (D.C.1990).

### B. The Evidence of Probable Cause.

Bruce contends in substance that the Commissioner's finding of probable cause at the preliminary hearing, as well as Bruce's indictment by the grand jury, were obtained by the government through the deliberate use of false evidence. No such contention was made in the trial court, nor did Bruce move to dismiss the indictment. There is thus no pertinent trial court ruling, erroneous or otherwise, before us for review.

In general, after a defendant has been convicted, courts will not entertain the contention that the evidence before the grand jury was insufficient to indict. *United States v. Williams*, — U.S. — —, 112 S.Ct. 1735, 1745–46, 118 L.Ed.2d 352 (1992). Even if we were disposed to do so here, there was ample testimony before the grand jury to support a finding of probable cause. *See Harris v. United States*, 333 A.2d 397, 400 (D.C.1975) (proof that defendant pointed an inoperable pistol at his victim sufficient to establish assault with dangerous weapon).[15] Moreover, Detective Doughty disclosed to the grand jury that Corporal Walker had stated on the scene that Bruce had not fired at him.[16]

### C. The Evidence at Trial.

Bruce also challenges the sufficiency of the prosecution's evidence at trial. He contends that Ms. Upshur's testimony

that neither party was claiming that he had done so.

**13.** We are distressed by the repeated characterization of Mrs. Upshur's testimony in Bruce's brief as deliberate perjury. Mrs. Upshur was a disinterested witness and had no apparent motive to lie. She was describing a fast-moving and frightening course of events. Human ability to observe is imperfect, and many people make mistakes under these conditions. Accusations of perjury should not be levelled at citizens without substantially more proof of intent to deceive than was present here.

**14.** This line of analysis could not, of course, be applied to *Napue* or *Giglio*. In those cases, the

defense lacked sufficient information to object and the judge had no basis for intervening *sua sponte;* the constitutional violation consisted of the State's concealment from the defense of exculpatory evidence. *See also Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**15.** The evidence before the Commissioner at arraignment was also sufficient.

**16.** The proceedings at which the detective failed to disclose Walker's admission—Bruce's presentment and the preliminary hearing—dealt with the question whether Bruce would be detained, and had no bearing on the validity of the indictment.

was "perjurious, inflammatory and impossible," that Corporal Walker's alleged self-contradictions rendered him untrustworthy, and that

> anyone who would believe [that] Nathaniel Bruce would point an inoperable weapon at the deadly armed Corporal Walker in the midst of being run down by Corporal Walker in his police car and shot at by Corporal Walker from virtually point blank range has to believe in the tooth fairy.

Counsel's characterization is colorful, but the prosecution's version is not the only one which might encounter a measure of skepticism. An impartial person might find at least as implausible the scenario suggested by Bruce's attorney, namely, that Bruce, though armed with a handgun, was an innocent fellow, and that he was being tormented by a Maryland trooper who tried both to run him down and to shoot him for no reason at all. No evidence was introduced to support this version of events.

In any event, in determining whether the judge should have granted Bruce's motion for judgment of acquittal, we must view the evidence in the light most favorable to the prosecution, and we must defer to the jury's prerogative of determining credibility, weighing the evidence, and drawing reasonable inferences. *Irick, supra,* 565 A.2d at 36. Not all criminal suspects exercise sound judgment under pressure, and it was the province of the jury to determine if Bruce, prudently or imprudently, pointed a pistol at Walker. This court cannot second-guess triers of fact who observed the witnesses and heard them testify. We are satisfied that the government's evidence was not "inherently incredible." *See, e.g., In re A.H.B.,* 491 A.2d 490, 496 n. 8 (D.C.

1985). The judge quite properly allowed the case to go to the jury.

## IV

## THE COLLATERAL ATTACK

### A. General Considerations.

In his post-trial motion to set aside his client's sentence pursuant to § 23–110, Bruce's new counsel makes numerous allegations of ineffectiveness on the part of his predecessor. Only one of them merits plenary discussion: [17]

> Defense counsel failed to expose the transparency of the prosecutor's theory. The prior statements of Corporal Walker and Officer Doughty, that Nathaniel Bruce had shot at Corporal Walker and that the gun smelled of cordite, should have been exposed to show how the stories changed and differed vastly from what was presented to the jury.... [18] It is absolutely unbelievable that someone being run down by a police cruiser would point an inoperable gun at an armed policeman in the car. Nathaniel Bruce was not trying to commit suicide.

In her order denying Bruce's motion without a hearing, the trial judge ruled on this issue as follows:

> Since Corporal Walker neither testified at the preliminary nor the grand jury hearings, there were no prior inconsistent statements with which to impeach Corporal Walker. Also, the test results forced the government to proceed on a weaker theory. In light of this, [trial counsel] made a tactical decision not to raise an issue that Defendant may have fired the gun.

Invoking the two-prong analysis of *Strickland v. Washington,* 466 U.S. 668, 687, 104

---

**17.** Substantially for the reasons stated by the trial judge, we reject all of the remaining contentions in Bruce's § 23–110 motion. We do note that, at sentencing, a prosecutor different from the one who tried the case asked the judge to impose a stiff sentence because, he suggested, shooting at police officers was unacceptable conduct. Bruce's trial counsel reminded the judge that the prosecution had abandoned the theory that Bruce shot at Walker. Bruce himself argued, with considerably more vigor than

his counsel did, that the government's "shooting" theory had been disproved.

**18.** Although this allegation might be viewed as somewhat conclusory, counsel attached to the motion excerpts from Detective Doughty's testimony, as well as other materials, which bore out the contrast between the government's evidence at trial and the version of events which the prosecution had presented at earlier stages of the case.

S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the judge concluded that Bruce had not demonstrated either that counsel's performance was deficient or that Bruce had suffered prejudice. The judge did not specifically address the question whether Bruce was entitled to a hearing on his motion.

■ Section 23-110(c) provides that "[u]nless the motion and files and records of the case *conclusively* show that the prisoner is entitled to no relief," the judge must grant "a prompt hearing thereon." (Emphasis added). The quoted language creates a presumption that a trial court presented with a § 23-110 motion alleging ineffectiveness of defense counsel should conduct a hearing. *Sykes v. United States*, 585 A.2d 1335, 1339 (D.C.1991). This is especially so where the allegations of ineffectiveness relate to facts outside the trial record. *Id.; see also Gray v. United States*, 617 A.2d 521, 523 (D.C. 1992); *Gibson v. United States*, 388 A.2d 1214, 1216 (D.C.1978) (per curiam).

In the present case, the judge concluded that Bruce's attorney made a "tactical" decision not to address the prior police version of events. She did so, however, without hearing any testimony from the attorney, and without Bruce's new counsel having been accorded an opportunity to cross-examine. The question is whether, despite the absence of a hearing, the record "conclusively" shows that Bruce is entitled to no relief. We hold that it does not.

*B. The "Deficient Performance" Prong.*

■ We turn first to *Strickland's* "deficient performance" prong. In that connection, our scrutiny of counsel's performance must be "highly deferential," and counsel is "strongly presumed to have rendered adequate assistance." *Strickland, supra*, 466 U.S. at 689–90, 104 S.Ct. at 2066; *Brewer v. United States*, 609 A.2d 1140, 1141 (D.C.1992).

In the present case, two witnesses—Corporal Walker and Mrs. Upshur—testified that Bruce pointed a pistol [19] at Walker and thus committed an assault on him. Both of these witnesses stated (Corporal Walker to Detective Doughty,[20] and Mrs. Upshur at trial) that Bruce had fired a shot at Walker. In light of the tests conducted by the FBI, these statements were evidently incorrect and might readily have been shown to be so. Such a showing would, at least, have potentially cast doubt on the accuracy of these witnesses' descriptions of other aspects of this encounter.[21] In order to cast such doubt on the prosecution case (or, as Bruce put it in his § 23-110 motion, to "expose the transparency of the prosecutor's theory"), trial counsel had to nail down the uncontested but elusive fact that Bruce did not fire the pistol. The record demonstrates that this was never done.

It is true that the crime scene search officer testified that the pistol which Bruce allegedly dropped as he ran from the scene was inoperable at the time it was tested at the firing range. By then, however, the weapon had fallen (or had been thrown) to the ground. It had broken into two parts. It was missing the firing pin and the spring. The trial jury might reasonably have concluded, as Detective Doughty had suggested to the grand jury, that the pistol became inoperable only as a result of its impact with the ground, and that Mrs. Upshur's testimony that it was fired before Bruce dropped it might well have been true.

The results of the FBI tests, which evidently established that the weapon had not been fired and that Bruce had not fired one, were never introduced into evidence. Although Bruce's counsel pointed out to the jury that the prosecutor had not said anything about the results of the tests, an attentive juror would doubtless have discerned that the defense had not produced

---

**19.** Mrs. Upshur did not actually see the pistol.

**20.** We do not agree with the trial judge's view that since Walker did not testify at the preliminary hearing or before the grand jury, he could not have been impeached. Walker could fruitfully have been examined—indeed, to a limited extent, he was—with regard to statements which

he made to Detective Doughty and to his own superiors in which he allegedly claimed that Bruce had fired at him.

**21.** Having concededly fired two shots at Bruce from relatively close range, Corporal Walker had a motive to exaggerate Bruce's misconduct in order to justify Walker's own response.

any evidence on the subject either. Under these circumstances, an impartial trier of fact could reasonably infer—indeed, such an inference might have been *the* most reasonable one—that *neither* side was in a position to rely on the tests.

The trial judge summarily concluded that, for "tactical" reasons, Bruce's defense attorney preferred not to impeach prosecution witnesses with their original statements that Bruce had shot at Walker. Her conclusion was apparently based on the perception that, since the government had been forced to make only the "weaker" argument that Bruce merely pointed the weapon at Walker, it would have been ill-advised for counsel to bring the accusations of shooting before the jury.

If such a tactical decision was made, however, then it was surely incumbent upon Bruce's attorney, (who was foregoing excellent opportunities for cross-examination and impeachment) to follow through, and to take the necessary steps to foreclose the possibility that the jurors would believe Bruce fired the weapon. He could have done this in various ways, *e.g.* by obtaining a stipulation from the prosecutor as to the results of the FBI tests, or by asking the judge to instruct the jury, contemporaneously with Mrs. Upshur's testimony, that there was no claim by either party that Bruce had fired the pistol.[22] The "tactical decision" attributed by the judge to counsel was thus never fully carried out.

It is, of course, easier for a reviewing court to discover barristerial errors and omissions after the fact than it is for an attorney to avoid them during the heat of battle. As we recently reiterated in *Brewer, supra,* 609 A.2d at 1142 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at

2065), courts must make every effort, in evaluating counsel's performance, "to eliminate the distorting effects of hindsight." Bruce's attorney obviously made some thoughtful arguments on his client's behalf. In fact, Bruce was acquitted of two of three charges against him. Nevertheless, in extreme cases, a claim of ineffectiveness may be grounded even on an isolated error of counsel. *Brewer, supra,* 609 A.2d at 1142–43. We are unable to say, in light of these authorities, that the record "conclusively" establishes that the performance of Bruce's trial counsel was not deficient.

### C. The Prejudice Prong.

■ To establish ineffective assistance under *Strickland,* the defendant must prove not only substandard representation but also resulting prejudice. Specifically, he must establish " 'a reasonable probability' that, but for his trial attorney's deficient performance, the outcome of the case would have been different." *Mack, supra,* 570 A.2d at 784. This is not an unreasonable burden, for

> the result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

*Id.* (quoting *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. at 2068).

The record does not conclusively show that there was no prejudice. If the defense had brought to the jury's attention that the government had claimed on several prior occasions that Bruce had shot at Walker, and that these claims had been abandoned in light of the FBI tests, the persuasive

---

**22.** In his § 23–110 motion, Bruce also criticizes his trial counsel for not "exposing" Detective Doughty. Doughty was not an eye-witness to the alleged assault, but he did testify at trial about Walker's identification of Bruce. By the time of trial, he was apparently an especially vulnerable witness. He had disclosed before the grand jury that Corporal Walker had told him, at the scene of the offense, that Bruce had not fired at Walker. Nevertheless, Doughty had sworn in his affidavit at arraignment, and had testified at the preliminary hearing, that according to Walker and perhaps others, Bruce had

fired at Walker. Doughty failed on these occasions to disclose Walker's contrary statement on the scene; each time his assertion that Bruce had fired at Walker was unequivocal.

From the perspective of a defendant, there are surely obvious tactical benefits to be gained from any showing that the detective in charge of the case has been less than forthright in his statements to the court. In fact, such lack of candor could be viewed by an impartial jury as rendering the government's entire submission untrustworthy. See text, *infra,* at page 996.

force of the entire prosecution case might have been impaired or undermined:

> [A] party's *falsehood* or *other fraud* in the preparation and presentation of his cause ... is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. *The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.*

II JOHN HENRY WIGMORE, EVIDENCE § 278, at 133 (Chadbourn ed. 1979) (emphasis added to last sentence only). *See also Mills v. United States*, 599 A.2d 775, 783–84 (D.C. 1991) (quoting WIGMORE).[23]

Moreover, defense counsel's principal theory during closing argument was that a man with an inoperable pistol would not be so foolish as to point it at an armed police officer. A jury might accept this argument if counsel first established that the results of the FBI tests were favorable to Bruce. Although people can do some rather foolish things under pressure, common sense and human experience suggest that a rational person, whether or not criminally oriented, would probably be reluctant to act in a manner that might well induce a police officer to blow that rational person's brains out. If Bruce's pistol was inoperable, and if Bruce knew it was inoperable, the argument that he would not be likely to point it

at Walker, thus apparently abandoning his instinct for self-preservation, might well create a reasonable doubt of his guilt in the mind of an impartial juror.

The jury never learned, however, that there was no gunpowder residue on Bruce's hands and that the pistol had not been fired. The possibility was thus left open that Bruce did fire the pistol and simply missed his target. Pointing a loaded and operable weapon at an officer would certainly appear to be very cruel indeed, but a fair juror might well view it as a great deal less irrational than pointing an inoperable weapon at him. Counsel's failure to take the necessary (and readily available) steps to show that Bruce had not shot at Walker potentially prejudiced his client. In any event, we are satisfied that the record does not conclusively demonstrate the contrary.

## V

## CONCLUSION

For the foregoing reasons, the judgment in No. 90–CF–686 (the direct appeal) is affirmed. In No. 92–CO–97, the order denying Bruce's § 23–110 motion is vacated, and the case is remanded for a hearing on that motion.

*So ordered.*

---

**23.** We do not suggest that there was in fact falsehood or fraud on the part of any of the officers involved. That is not a question for an appellate court to decide. Arguably, however, an impartial jury apprised of the results of the FBI tests might rationally discern possible deception on the part of the police, or at least negligent inattention to the need for precise and accurate support for incriminating testimony.

A fair jury might base such an unfavorable assessment on Detective Doughty's unqualified assertions at the earlier hearings that Bruce shot at Walker, on the results of the swab tests, and of the tests that proved that the pistol was inoperable and had not been fired, and on Doughty's omission from his PD 163 and from his testimony at the preliminary hearing of Walker's admission that Bruce did not shoot at him.