Leon K. MATTHEWS, Appellant,

v.

UNITED STATES, Appellee.

Nos. 85–CF–1368, 87–CO–395, 90–CO–111 and 92–CO–29.

District of Columbia Court of Appeals.

Argued March 2, 1993.
Decided July 26, 1993.

Barbara E. Sosnick, appointed by this court, for appellant.

Kenneth C. Kohl, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, John R. Fisher, Roy W. McLeese III and Charles L. Hall, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY and SCHWELB, Associate Judges.

ROGERS, Chief Judge:

These four consolidated appeals arise from the murder and robbery of Arthur Gluckman on January 6, 1984. Appellant was convicted by a jury of first-degree premeditated murder while armed, D.C.Code §§ 22–2402, –3202 (Repl.1989), kidnapping, *id.* § 22–2101, robbery, *id.* § 22–2901, unauthorized use of a vehicle, *id.* § 22–3815, second-degree burglary, *id.* § 22–1801(b), and second-degree theft, *id.* § 22–3811, –3812(b). He appeals from his convictions on the grounds that there was insufficient evidence and improper prosecutorial closing argument; he also contends that some of his convictions merge. In addition, he appeals from the denial of his motion for reduction of sentence on the grounds that the motions judge abused his discretion. We find these contentions unpersuasive.

Appellant filed two post-trial motions: a motion for dismissal of the indictment or for a new trial under Super.Ct.Crim.R. 33, on the grounds of newly discovered evidence and *Brady*[1] violations, and a supplementary motion to vacate his convictions and for a new trial, pursuant to D.C.Code § 23–110 (Repl.1989), because of the trial court's failure to hold a *Monroe–Farrell*[2] hearing, ineffective assistance of counsel at trial and sentencing, violations of the Jencks Act,[3] additional *Brady* violations, and newly discovered evidence. Both motions were denied. Among appellant's contentions on appeal are that he should be

---

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. *Monroe v. United States,* 389 A.2d 811 (D.C.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *Farrell v. United States,* 391 A.2d 755 (D.C.1978).

3. 18 U.S.C. § 3500 (1988).

granted a new trial because of the failure to hold hearings on his ineffective assistance of counsel claims. We agree that hearings should have been held on appellant's Sixth Amendment claims, but we find no merit to his other contentions.

Accordingly, we remand the case to the trial court to conduct a *Monroe–Farrell* hearing to determine whether, viewed pretrial, appellant was denied the effective assistance of counsel. If the court so concludes, then the trial court shall vacate appellant's convictions and grant a new trial. If the trial court concludes that appellant was not denied his pretrial right to the effective assistance of counsel, the trial court shall make appropriate findings of fact sufficient for appellate review, in the event appellant should appeal. Thereafter, the court shall hold a hearing on appellant's post-conviction claim that he was denied the effective assistance of counsel and make appropriate findings of fact, unless the court concludes appellant's Sixth Amendment right to counsel was violated and a new trial is required.

## I.

Appellant Leon K. Matthews, then aged fifteen, and two adults, Gary Hill and Dale Givens, were arrested for the murder of Arthur Gluckman, the unauthorized use of his automobile, and the burglary of his home. Ten months before appellant's trial, Hill and Givens entered pre-indictment pleas and were sentenced.[4] Hill, a convicted felon, was the government's key witness at the trial; Dale Givens did not testify.

According to Hill's trial testimony, he and Givens hit Arthur Gluckman over the head on January 6, 1984, while he was getting into his car. They forced Mr.

Gluckman into the front seat and robbed him. Givens bound and gagged him with rope and a handkerchief and pushed him into the back seat. When Mr. Gluckman protested, Givens hit him over the head several times with a flashlight, causing Mr. Gluckman to lose consciousness for five to ten minutes. Hill and Givens then drove around the city, stopping briefly at Givens' sister's house (Irene Givens), and they later got high on PCP. When Givens[5] asked Hill if he wanted to burglarize Mr. Gluckman's home, and Hill said no, Givens said he was going to get appellant. Givens then drove the car back towards his sister's home, looking for appellant, and called to appellant when he saw appellant walking on the street.

When appellant walked over to the car, according to Hill, appellant looked down at the bound and gagged Mr. Gluckman and said "What the F was this?" Hill testified that Givens said not to worry and asked appellant if he wanted to rob the Gluckman home with him. Appellant climbed into the back seat of the car and put his feet on top of Mr. Gluckman, who was laid out in the well of the back seat. Hill and Givens, who were getting high on PCP and marijuana, began to drink liquor; appellant did not drink alcohol, although he did use drugs.

Hill testified that at some point Givens decided to kill Mr. Gluckman. According to Hill, Givens wrapped a second rope around Mr. Gluckman's neck and began to choke him. Hill testified that appellant kicked Mr. Gluckman while he was being strangled, and only stopped "stomping on" him when Givens tied the rope to the front seat headrest, pulled up on the headrest twice, and killed Mr. Gluckman.[6]

---

**4.** In connection with incidents on five different days and five different victims, Hill and Givens entered pre-indictment pleas before Judge Hamilton on June 28, 1984, to one count each of murder in the second-degree while armed, kidnapping, rape while armed, attempted kidnapping, armed robbery, attempted kidnapping, assault with a dangerous weapon, one count of attempted kidnapping, attempted burglary in the first-degree and one count of attempted robbery. For the five different incidents, Hill was sentenced on September 6, 1984, to forty-four

years to life. Givens was sentenced a month later, on November 9, 1984, but the record before the court does not indicate the sentence that he received.

**5.** Hereinafter, references to Givens are references to Dale Givens.

**6.** A forensic pathologist stated that there were "various scrapes and small lacerations or tears in the skin" that were consistent with someone

The three men then drove Mr. Gluckman's car to his apartment. Hill testified that Givens and appellant used the keys taken from Mr. Gluckman's pockets to enter the apartment while he (Hill) acted as a lookout. Givens and appellant reemerged about half an hour later with three plastic garbage bags and a brown leather bag; appellant was carrying two of the plastic bags. The three men took the items to Irene Givens' house and divided them up. According to Hill, appellant took a watch and a "whole bunch of change," and then left.[7]

The government also presented evidence that appellant talked about the murder with three people. Bruce Chase, age 21 and a friend of all three defendants, testified that in January, 1984, while at Givens' house, appellant showed him Mr. Gluckman's driver's license and told him "that was the man they robbed." According to Chase, appellant said, "[h]e dead, I know he dead." Givens told appellant to be quiet. Sylvester Givens, age 23 and Dale Givens' brother, testified that on January 8, 1984, while at his sister Irene Givens' apartment, appellant told "[h]ow they killed the man," without saying whether or not he was in the car at the time, but admitting he was in a parking lot where it happened and at some point had been in the

back of the car. Sylvester Givens admitted that he had cashed the pennies that were in the jar taken from Mr. Gluckman's home, and after having his memory refreshed with his grand jury testimony, Sylvester recalled that he had told the grand jury that appellant had said that the man had said, "don't kill him, you know, let him go, he won't tell anybody." Givens' sister Irene Givens, age 25, testified that appellant had told her that he had driven around with Dale Givens and Hill and was in the back seat and had seen something in the back seat, but he did not say what it was.

Appellant did not present any witnesses. The jury found appellant guilty as charged, except that appellant was convicted of second-degree theft instead of first-degree theft. Following trial counsel's statement on appellant's behalf, the trial judge sentenced appellant as an adult to a total of 30 years and four months to life.[8]

Following the denial of a motion for a reduction of sentence on March 18, 1987, by Judge Scott, who was substituted for the deceased trial judge, appellant filed, on September 18, 1987, a motion to dismiss the indictment or for a new trial on the grounds of newly discovered evidence and *Brady* violations by the prosecutor relating to Hill.[9] Appellant also filed, on April 18,

---

kicking or stomping Mr. Gluckman. There were no bruises on Mr. Gluckman's legs or torso indicating that he had been kicked. The pathologist suggested that the victim's heavy layered clothing could have protected him from more bruises.

7. The next day, Hill testified, he joined Givens, who was driving Mr. Gluckman's car, and they continued to drive around while Mr. Gluckman's body was in the back seat, covered with a board and blankets. Upon running out of gas, they abandoned the car at a gas station, and the body was discovered four days later. On cross-examination, Hill was impeached with his prior convictions as well as his grand jury testimony, in which he had said that Mr. Gluckman was still alive when the burglary of his home occurred, and a statement of January 29, 1984, that he had given to Detective Kilkullen when he also said the burglary had preceded the murder and further that appellant had not gone inside of Mr. Gluckman's home.

8. Before sentence was imposed, trial counsel pointed out that appellant, who was only 15 at

the time of the crimes and 17 years old at sentencing, came from a deprived background, and although associating with two men with long criminal records, appellant had not previously been involved in acts of violence. In addition, counsel emphasized the inconsistencies in Hill's trial testimony concerning the murder. Appellant and his mother also spoke before appellant was sentenced. The trial judge complimented trial counsel on his presentation. The trial judge sentenced appellant to consecutive sentences of twenty years to life for premeditated murder, three to ten years each for kidnapping, robbery, and second-degree burglary, twelve to thirty-six months for unauthorized use of an automobile, and four to twelve months for second-degree theft. Appellant was also fined five hundred dollars.

9. The new evidence was an affidavit dated September 14, 1987, attached to the motion, in which Hill recanted his trial testimony to admit his greater involvement in Mr. Gluckman's murder and in the burglary and to deny appellant's involvement. In his affidavit, Hill stated that

1988, a supplementary motion to vacate his convictions and for a new trial, pursuant to D.C.Code § 23–110, on the grounds of the failure of the trial court to hold a *Monroe–Farrell* hearing, ineffective assistance of trial counsel, violations of the Jencks Act, additional *Brady* violations and newly discovered evidence.[10] In the motion appellant identified as "the most significant of [trial counsel's] many failures" the fact that "[t]here is no indication that [trial counsel] interviewed any government witnesses prior to trial, including the two codefendants, who were clearly known to [trial counsel], and who no longer retained Fifth Amendment rights against self-incrimination at the time of [appellant's] trial." He cited *Johnson v. United States*, 413 A.2d 499, 503 (D.C.1980), and other cases, including *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for the proposition that defense counsel has a "duty to conduct an independent investigation of the facts and circumstances" of the case. Nevertheless, on January 5, 1990, the motions judge denied most of appellant's claims without a hearing, including his claim of ineffective assistance of counsel. The motions judge did hold an evidentiary hearing with respect to Hill's recantation, Givens' statement, and alleged *Brady* violations. Appellant testified at the hearing and also presented testimony by Givens and Hill.

At the motions hearing, Givens testified that appellant had not strangled Mr. Gluckman, and that appellant did not enter the car until after Mr. Gluckman was dead. Givens also claimed that before appellant's trial he had told Detective Kilcullen that appellant had not been involved with the killing, although he had been a lookout for the burglary.[11] Hill recanted his trial testimony and testified that appellant had not been present during the killing, did not kick Mr. Gluckman, did not participate in the burglary, and did not indicate whether he noticed Mr. Gluckman when he got into the back seat of the car.[12] Appellant testified that he was not present at the killing, but did act as a lookout for the burglary, and that he had told his trial counsel many times that he had not seen Hill or Givens strangle Mr. Gluckman.[13]

The motions judge denied the remainder of the post-trial motions on October 10, 1991. He found Hill's recantation and testimony "highly incredible" and credited the government's witnesses' testimony.[14] He

appellant had only been in the car for a brief time (about five minutes) after the murder and burglary had been completed. He was unsure whether appellant ever saw the body, which was covered with a board.

10. The new newly discovered evidence was a statement by Dale Givens dated February 24, 1988, indicating appellant's noninvolvement in the crimes and stating that he had made statements to the government exculpating appellant. Also attached to the motion was an affidavit by two investigators who stated that Sylvester Givens had recanted his trial testimony in a conversation with them.

11. Givens was impeached with prior convictions and admitted, in addition to being a friend of appellant's, that he was housed in the same correctional facility with appellant. He denied that he had ever discussed the case with appellant although he "could have [seen appellant] more than a hundred times."

12. Hill explained that his trial testimony had been different because the prosecutor had promised to let the judge know of his cooperation and the police had told him that appellant was the person who had turned him in. Hill

was impeached with his prior statements to the grand jury, the police, and a probation officer.

13. Appellant also testified that the videotaped statement taken after his arrest, in which he admitted being present during the murder and burglary, was not voluntary. The government did not use appellant's videotaped statement at trial. In his post-trial motion, appellant argued that had trial counsel succeeded in having the trial judge suppress the statement, appellant might have testified at trial.

14. Detectives Kilcullen and Corboy denied that any promises had been made to Hill, that guns were used at the time of appellant's arrest, that threats were made against appellant or that Hill or Givens had indicated to them that appellant was uninvolved with the crimes. The trial prosecutor testified that Hill and Givens had not told him that appellant was uninvolved with the crimes and that he had made no promises to Hill, although he admitted that he possibly could have told Hill that "if there was ever a need for me to make known his level of cooperation, I would do that." The prosecutor pointed out, however, that Hill had already been sentenced at the time of his testimony at appellant's

also ruled that Givens' statement was not newly discovered since Givens had told appellant prior to his trial that Givens knew appellant was innocent; alternatively, treating Givens' statement as newly discovered evidence, the judge found Givens' statement and hearing testimony "untrue and unreliable." The judge also found no *Brady* violations and rejected appellant's contention that his videotaped statement was involuntary, finding appellant "wholly lacking in credibility and his testimony rife with misrepresentations."

## II.

In the motion to vacate his convictions and for a new trial, appellant maintained that the trial court, specifically, the status judge, erred in not conducting a *Monroe-Farrell* inquiry. At a pre-indictment plea hearing on July 5, 1984, before the status judge, appellant indicated that he wished to have another attorney: [15]

DEFENSE COUNSEL: He [appellant] is requesting another attorney.

THE COURT: What is he talking about?

[APPELLANT]: I don't like him. I don't want him to be my lawyer no more.

THE COURT: That is too bad. What is the charge?

DEFENSE COUNSEL: First degree murder, felony murder.

THE COURT: You have an attorney, Mr. Matthews. Until I hear something of substance to suggest that you are entitled to a new one, I am not going to make any change. You can't shop around and have every attorney in the city representing you; do you understand that?

[APPELLANT]: Yes. I feel as though my lawyer is not representing me the way I think I should be represented as far as the case is concerned.

THE COURT: I assume this case will be presented to the grand jury, will be indicted as a felony I.

When you appear before a felony I judge, you make your concerns known to the felony I judge. Step back with the Marshal.

[APPELLANT]: Your Honor, could I say a few things?

THE COURT: I don't need to hear anything from you. Step back with the Marshal. As far as I am concerned, [trial counsel] is still your attorney.

Appellant never brought up the matter with Chief Judge Moultrie, the Felony I judge assigned to preside at appellant's trial.

It is well established that the trial court is required to investigate a pretrial challenge to trial counsel's effectiveness based "on the ground that counsel, due to lack of investigation, preparation, or other substantial reason, is not rendering reasonably effective assistance." *Monroe, supra* note 2, 389 A.2d at 820. In the instant case appellant stated to the status judge that he was not being represented in the way he felt he should be. General assertions that a defendant wants a new lawyer are not enough to trigger a *Monroe/Farrell* inquiry.[16] *Robinson v. United States,* 565 A.2d 964, 968 (D.C.1989); *cf. Lewis v. United States,* 430 A.2d 528, 529 (D.C.1981) (defendant never said anything at all about his current counsel, another lawyer simply appeared), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1989). However, the trial court may not prevent a defendant

trial; he made no reference to the allegation in appellant's motion that Hill claimed there had been discussions about a motion to reduce his sentence.

15. Trial counsel advised the status judge that appellant had just informed him that he did not want to accept the government's plea offer and wanted to proceed to trial.

16. The government relies on *McFadden v. United States,* 614 A.2d 11, 15 (D.C.1992), and *Nelson*

*v. United States,* 601 A.2d 582, 592 (D.C.1991), for the premise that the scope of the inquiry is up to the judge and therefore, under these circumstances, the status judge did not abuse his discretion. Both of those cases, however, are quoting *Monroe,* which goes on to say that while the scope of the inquiry is up to the judge, the judge must ask specific questions on the record to elicit whether counsel is being effective. *Monroe, supra* note 2, 389 A.2d at 821. The government's reliance is, therefore, misplaced.

from explaining why he or she wants a new counsel. *Robinson, supra,* 565 A.2d at 968.

The motions judge addressed this issue in denying appellant's motion to vacate on the ground of ineffective assistance of trial counsel, and found no error on the part of the status judge since appellant had failed to raise the issue again with the Felony I judge, as the status judge had instructed. The motions judge noted that appellant had appeared twice before Chief Judge Moultrie—at arraignment on February 7, 1985, and at a status hearing on February 28, 1985—but appellant does not contend, and the record does not show, that he raised any complaints about trial counsel. The motions judge concluded that the "[appellant's] statements at the hearing on July 25, 1984, with nothing more, were not sufficient to trigger a *Monroe/Farrell* hearing." While the motions judge was correct in part, he failed to take into account the fact that appellant had been cut off by the status judge before he had an opportunity to allege more.

■ The record shows that appellant, although only 16 years old and having heard the status judge tell him that it was "too bad" and that he could not shop around the city for an attorney, attempted to continue talking. But, the status judge, although informed that appellant was facing a first-degree felony murder charge, cut him off, saying "I don't need to hear anything from you.... As far as I am concerned, [trial counsel] is still your attorney." Under these circumstances, we hold that the status judge erred by failing to conduct an inquiry to assure that appellant's Sixth Amendment right was being protected.

*See Bass v. United States,* 580 A.2d 669, 672 (D.C.1990) (prompt attention required to pretrial complaints against counsel); *Fields v. United States,* 466 A.2d 822, 824 (D.C.1983), *cert. denied,* 464 U.S. 998, 104 S.Ct. 497, 78 L.Ed.2d 690 (1983) (trial court "must conduct an on-the-record hearing to determine whether counsel is providing representation within the range of competence demanded in criminal cases," and "must make on-the-record findings sufficient to permit meaningful appellate review on the issue of the ability and preparedness of counsel to render effective assistance under the prevailing circumstances").

■ Appellant was clearly at the point where he was entitled to have the effective assistance of counsel. *See Coleman v. Alabama,* 399 U.S. 1, 9–10, 90 S.Ct. 1999, 2003–04, 26 L.Ed.2d 387 (1970). While the status judge may have viewed his role as having ended when appellant decided not to enter a plea, and believed that the Felony I judge would have addressed appellant's concerns, this court has made it clear that the point at which appellant spoke to the status judge is an important time for a defendant to have effective assistance of counsel.[17] *See McFadden, supra* note 16, 614 A.2d at 13–14 (pointing to the importance of counsel at this stage of the proceedings); *Monroe, supra* note 2, 389 A.2d at 816–17, 819. It is obvious that it was important for appellant to have effective assistance of counsel during the pretrial stage. Appellant and his counsel were considering a plea to charges which would have exposed appellant to lengthy imprisonment, and appellant decided against entering a plea, thereby increasing his exposure to a longer sentence.[18] Furthermore,

---

**17.** Since this would presumably be the status judge's last encounter with the case, the status judge might understandably believe that it would make sense for the Felony I judge, who would inherit the case, to make the decision as to appellant's representation. As is likely in a crowded urban court, however, substantial time (seven months) passed before appellant's case came before the Felony I judge. Consequently, if appellant had a legitimate complaint about his counsel, he was entitled to have it promptly resolved, so that an effective attorney could begin at once to prepare appellant's defense. Also, no entry was made in the trial court case

jacket to alert the Felony I judge to appellant's expression of concern about trial counsel.

**18.** At the post-trial motions hearing, the trial prosecutor testified that he told appellant to speak to his attorney about whether the prosecutor should "initiate discussions with [his] supervisors for one of the two plea offers, either voluntary manslaughter and burglary, and burglary, second-degree burglary or kidnapping and second-degree burglary." Either way, appellant would avoid a mandatory minimum sentence of twenty years for murder. Appellant

having been rebuffed by the status judge on a baseless ground,[19] it is not implausible for appellant to conclude that the trial judge would be unlikely to be any more receptive to appellant's complaints about trial counsel than the status judge had been. Appellant's failure to bring up the claim again could indicate that it was baseless. In light of the status judge's response to appellant's request, on the other hand, appellant may understandably have been afraid to bring up the matter again. Moreover, he had no one to advise him except the attorney whose removal he had requested.

The question remains whether affirmance, reversal, or a remand on this issue is appropriate. *See McFadden, supra* note 16, 614 A.2d at 16–18. This is not a case, as in *Farrell, supra* note 2, 391 A.2d at 757, where the defendant's complaint arose only two days before trial and the defendant proceeded *pro se* at trial. In fact, appellant raised his complaint about trial counsel seven months before his first appearance before the Felony I judge for a status conference. *See McFadden, supra* note 16, 614 A.2d at 16–17 (citing *Nelson, supra* note 16, 601 A.2d at 582, (complaint just before jury sworn)); *Bass, supra,* 580 A.2d at 671 (complaint three months before trial); *Matthews v. United States,* 459 A.2d 1063, 1064 (D.C.1983) (complaint three weeks before trial). Nor is this a case, as in *McFadden, supra* note 16, 614 A.2d at 16, where trial counsel recited on the record his lack of preparation and, hence, a reversal was clearly required. *See also Monroe, supra* note 2, 389 A.2d at 822–23 (affirming, where *sua sponte* declarations by counsel of steps he had taken (albeit after judge had denied defendant's motion), and the government's case, viewed pretrial, was strong and no credible defense was suggested by the circumstances of the case). Since neither the status judge nor

the motions judge held a hearing on the ineffective assistance of counsel claims, there is no evidentiary record of trial counsel's pretrial preparation. Although the trial court record sheds some light on appellant's complaints, it is obviously incomplete as to trial counsel's pretrial preparation. *See Nelson, supra* note 16, 601 A.2d at 592 (actual performance at trial is circumstantial evidence on issue whether counsel adequately prepared before trial); Part III, *infra.*

■ In the absence of trial counsel's testimony, or of a statement on the record by him about his pretrial preparation, neither reversal nor affirmance is warranted. *Cf. Monroe, supra* note 2, 389 A.2d at 823 (adequate record to affirm). Rather, a remand is required in order to afford the government an opportunity to demonstrate that trial counsel's pretrial preparation was adequate. *See Nelson, supra* note 16, 601 A.2d at 592 (quoting *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 1807–08, 60 L.Ed.2d 323 (1979)). Accordingly, we remand the case to the trial court to determine, after a hearing, whether or not, viewed pretrial, appellant was denied the effective assistance of counsel.

### III.

Appellant also contends that the motions judge erred in denying, without a hearing, his § 23–110 motion in which he claimed that he was denied the effective assistance of trial counsel. The court has emphasized the need for an evidentiary hearing where ineffective assistance of counsel claims are at issue because the relevant facts cannot usually be determined on the basis of the trial record alone. *See Gibson v. United States,* 388 A.2d 1214, 1216 (D.C.1978). This is clearly the case here.

---

told the prosecutor that he wanted to go to trial. At the post-trial motions hearing, appellant testified that he had tried to advise the status judge about his concern with his trial counsel, in particular that his trial counsel only wanted to hear about his pleading guilty and was trying to make appellant admit to things that he did not do.

**19.** The record indicates that trial counsel was appellant's only counsel of record in the trial court, and hence the status judge had no basis for implying that appellant had been "shop[ping] around and [sought to] have every attorney in the city representing [him]."

The statute provides that the trial court shall hold a prompt hearing unless the files and records establish beyond doubt that the movant would be entitled to no relief if the allegations were proven. *See Gaston v. United States,* 535 A.2d 893, 898 (D.C.1988); D.C.Code § 23–110(c) (Repl.1989). Appellant's motions papers demonstrate that a hearing could not properly be denied on the basis of any of the grounds permitted under the statute, namely, that the motion consists of "(1) vague and conclusory allegations; [or] (2) palpably incredible claims; [or] (3) assertions that would not merit relief even if true." *Wright v. United States,* 608 A.2d 763, 766 (D.C.1992).

Of course, under *Strickland v. Washington, supra,* 466 U.S. at 687, 104 S.Ct. at 2064, appellant bears the burden of overcoming a two-pronged test. Appellant claims, on the basis of trial counsel's file, that trial counsel failed to interview appellant's co-defendants, Hill and Givens, who were the only eyewitnesses to the murder, and the only persons who could testify so as to assure appellant's culpability for murder and the other associated crimes of which he was convicted. The motions judge concluded that there was no need for trial counsel to interview either Hill or Givens "because counsel knew the substance of their statements from their testimony at prior proceedings, statements to the police and counsel's numerous interviews with the prosecutors and the witnesses' attorneys." [20]

With respect to the first (deficient performance) prong of *Strickland,* the motions judge erred in concluding that appellant was not entitled to a hearing where his trial counsel allegedly failed to conduct pretrial interviews of the only two people in a position to incriminate appellant in first-degree murder, especially since both men had been sentenced and could not avail themselves of a Fifth Amendment privilege not to testify at appellant's trial. *See Byrd v. United States,* 614 A.2d 25, 30 (D.C.1992) ("[t]he failure to make a proper pretrial investigation, to interview exculpatory witnesses, and to present their testimony, constitutes constitutional ineffectiveness") (citing *Sykes v. United States,* 585 A.2d 1335, 1338 (D.C.1991); *Ramsey v. United States,* 569 A.2d 142, 147 (D.C. 1990)).[21] A criminal defendant is entitled under the Sixth Amendment to representation by counsel who conducts himself or herself in accordance with the minimum standards for competence for counsel in a criminal case. *Strickland v. Washington, supra,* 466 U.S. at 687–88, 104 S.Ct. at 2064–65. If appellant can show that he did not receive such representation, the remaining question is whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result

---

**20.** In support of this conclusion the motions judge referred to the assertion in the government's opposition to appellant's motion to vacate his convictions, that trial counsel had met with prosecutors "no less than twenty times to obtain discovery, negotiate a plea offer, and prepare for trial. Govt's Opp. at 9."

**21.** Ordinarily, it is trial counsel's responsibility to interview available eye-witnesses to the crime, whether exculpatory or inculpatory. *See Miller v. United States,* 479 A.2d 862, 870 (D.C. 1984) ("Counsel has an obligation to interview witnesses known to have knowledge of the crime with which the defendant is charged, at least where there is reason to believe the testimony will be favorable to the defense") (citation omitted). *Shepard v. United States,* 533 A.2d 1278 (D.C.1987), on which the government relies, is distinguishable. In that case, the claim was made that defense counsel had not interviewed the accomplice, who was the principal witness for the government in an armed robbery case. However, the defendant's only claim was that trial counsel would have learned of the accomplice's mental incompetency, a fact trial counsel learned "at the latest" at trial. *Id.* at 1284. The court noted that the defendant had failed to show any basis for concluding that the trial judge would have granted an earlier motion to find the accomplice incompetent. *Id.* In the instant case, by contrast, appellant alleges that trial counsel failed to interview the only eyewitnesses to the murder and suggests several ways in which he suffered prejudice during as well as before trial. Moreover, the opinion in Shepard's direct appeal, *Hilton v. United States,* 435 A.2d 383, 392 n. 4 (D.C.1981), indicates that there was significant evidence from other witnesses to corroborate the accomplice's testimony implicating Shepard. By contrast, the evidence corroborating Hill's testimony in the instant case with regard to appellant's participation in the crimes was meager at best.

is reliable." *Id.* at 687, 104 S.Ct. at 2064; *see Mack v. United States,* 570 A.2d 777, 783 (D.C.1990). Appellant has clearly demonstrated the need for a hearing at which trial counsel testifies in order to afford the government an opportunity to make a record to explain alleged circumstances that, without some reasonable explanation, appear incompatible, in our view, with the minimum standards for pretrial preparation in a criminal case. *See id.* While trial counsel may be able, at a hearing, to offer a reasonable explanation of the manner in which he prepared for trial, the motions judge could not determine without a hearing that trial counsel's alleged omissions resulted from reasonable tactical decisions. *See Strickland v. Washington, supra,* 466 U.S. at 690, 104 S.Ct. at 2065–66 ("a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy' ") (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)); *Boyd v. United States,* 586 A.2d 670, 673 (D.C.1991) (cross-examination involves tactical decisions); *Gillis v. United States,* 586 A.2d 726, 728–29 (D.C.1991) (attorney cannot simply say it was tactical, but must explain reasons).

■ Nor can we agree with the motions judge's evaluation of the second (prejudice) prong of *Strickland.* Contrary to the motions judge's view, the record does not support the conclusion that Hill and Givens would necessarily have provided appellant's trial counsel with only the conclusory information that the prosecutor and police claimed the witnesses had given to them prior to appellant's trial. *Cf. Miller, supra* note 20, 479 A.2d at 870. Neither can we agree, as the government suggests, that appellant has failed to show that it would be reasonable to assume that trial counsel would have learned from interviewing these witnesses prior to trial the equivalent of the exculpatory statements that the witnesses are now making. Givens and appellant were good friends, and Givens did not testify for the government at trial. Indeed, Givens told the police that appellant was only involved in the burglary, not the murder, and that he would not testify against appellant. Furthermore, although Hill suggested in his motions testimony that he wanted to get back at appellant for implicating him in the crimes, Hill's statements to the government prior to appellant's trial did not directly implicate appellant. Hence, based on the record before the court, it is unreasonable to conclude that Hill and Givens, who had already pled guilty, would not have been forthcoming with appellant's trial counsel and that counsel could not have taken sworn statements from them that would have been favorable to appellant.

For similar reasons, appellant's claim that he was denied the effective assistance of counsel because trial counsel failed to make a *Brady* request broad enough to reach Hill's plea transcript [22] and the statements made by Sylvester Givens, Irene Givens and Dale Givens, together with the other evidence, may affect the determination whether appellant has satisfied the second prong of *Strickland.* [23] *See Asbell v. United States,* 436 A.2d 804, 807 (D.C. 1981). In negotiating with the government for a plea agreement, as well as in preparing for trial, trial counsel in a murder case

22. The plea hearing transcript was significant, not only because Hill stated that the murder occurred after the burglary, but because it showed that Hill and Givens together had been on a rampage of similar crimes on five different occasions, *see* note 4, *supra,* and that Hill had explained how he and Givens had alone subdued Mr. Gluckman on January 7, 1984, without the need for assistance of a third person.

23. The motions judge did not address this *Brady* contention in the context of the cumulative effect of counsel's failures on the prejudice prong of *Strickland.* The record does not indicate that Hill's videotaped statement to the police or his written statements to the police were given to trial counsel before trial. The argument that the statements were turned over as Jencks material at trial and were, according to the government, not exculpatory, is not dispositive. *See James v. United States,* 580 A.2d 636, 643 (D.C. 1990) (the prosecutor's obligations under *Brady* and the Jencks Act are not the same).

would need to know in a timely fashion exactly what the government's witnesses were going to say; it is not simply a matter of receiving Jencks statements for use as impeachment. *See James,* supra, note 23, 580 A.2d at 644 (timing of *Brady* disclosure is relevant to consideration of whether a defendant has been denied a fair trial). *See also United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976); *Frezzell v. United States,* 380 A.2d 1382, 1385 (D.C.1977), *cert. denied,* 439 U.S. 931, 99 S.Ct. 319, 58 L.Ed.2d 324 (1978). To the extent that Hill was the government's key witness, the greater the impeachment of his trial testimony, the greater the likelihood that the jury would have discredited his version of events at trial rather than his version at the time he entered his guilty pleas. The testimony of the government's other witnesses provided corroboration for the fact that the charged crimes occurred, but little, if any, corroboration of appellant's involvement in the murder; their testimony, moreover, is, literally, consistent with Hill's statements before appellant's trial as well as his affidavit and motions testimony.[24] The strength of the impeachment would have been increased, in addition, by introduction of the extrinsic evidence of Hill's prior statements.[25] *Cf. Johnson v. United States,* 413 A.2d 499, 504 (D.C.1980) (failure to use evidence to impeach can constitute ineffective assistance of counsel). Consequently, while each claim of ineffectiveness can be viewed in isolation, and might be found (much as the motions judge found them) not to warrant relief under the second

prong of the *Strickland* test, *see Strickland v. Washington,* supra, 466 U.S. at 691–92, 104 S.Ct. at 2066–67, in cumulative effect the ultimate conclusion may be different.

In the absence of testimony from trial counsel, the motions judge was not in a position to be able to determine whether, assuming trial counsel did not interview Givens and Hill, trial counsel had a reasonable basis for not interviewing them as well as the other government witnesses. *See Gillis,* supra, 586 A.2d at 728–29. Whether or not the interviews with the government's witnesses would have changed the result of the trial cannot be determined on this record without a hearing. The trial prosecutor's testimony at the motions hearing that he gave Hill's and Givens' statements to trial counsel during plea negotiations, and trial counsel's use of the statements to impeach Hill at trial, did not conclusively establish, without a hearing, that appellant could not satisfy the second *Strickland* prong.

## IV.

In his direct appeal from his convictions, appellant contends that there was insufficient evidence to support his convictions, that the prosecutor misstated the evidence and inflamed the jury during closing argument, and that some of his convictions merge.

 A. *Sufficiency.* Viewing the evidence as we must in the light most favorable to the government,[26] Hill's testi-

---

24. The government's argument that when Mr. Gluckman was killed is immaterial since Hill's testimony was unequivocal about the fact that appellant had aided and abetted in the killing misses the point. Hill's testimony on that point was subject to extensive impeachment. Likewise, the government's argument that the timing of the murder was immaterial, because Sylvester Givens had testified that appellant admitted being present at the time of the murder, misses the mark; Sylvester Givens' testimony did not place appellant inside of the car at the time of the murder or explain the circumstances of his being present.

25. In his motion appellant argued that trial counsel had failed properly to impeach the gov-

ernment witnesses because he had not introduced the extrinsic evidence of Hill's videotaped and written statements to the police, and because he had not impeached Hill with the fact that he had not previously claimed that appellant had kicked Mr. Gluckman or about when Mr. Gluckman was tied to the headrest. The motions judge rejected this contention, finding that trial counsel effectively impeached Hill many times, concluding that trial "[c]ounsel's impeachment of witnesses was not substandard so as to deprive defendant of his right to counsel under the Sixth Amendment."

26. *See, e.g., Driver v. United States,* 521 A.2d 254, 259 (D.C.1987).

mony, and the testimony of other government witnesses about appellant's statements following the murder, provided sufficient evidence to show that appellant aided and abetted the murder of Mr. Gluckman. With regard to the first-degree murder conviction, the evidence showed more than appellant's mere presence at the scene. *See In re L.A.V.*, 578 A.2d 708, 710 (D.C.1990). According to Hill, appellant entered the car while a kidnapping was obviously underway, and his presence in the back seat helped to assure Mr. Gluckman's continued confinement. In addition, according to Hill, appellant assisted in the strangulation by kicking Mr. Gluckman while he was being choked and then continuing to kick him until Givens tied the rope around the headrest. *See Leonard v. United States*, 602 A.2d 1112, 1115 (D.C.1992) (defendant aided and abetted crime by purposefully distracting decedent so shooter could get into position); *Miller v. United States*, 479 A.2d 862, 865 (D.C.1984); *Hackney v. United States*, 389 A.2d 1336, 1341, 1343 (D.C. 1978) (defendant beat victim on chest and stomach with steel clamp while codefendant continued to choke the victim; defendant "either acted upon a premeditated design to cause the death of the deceased or knew that the perpetrator was acting with such an intent") (quoting PERKINS, CRIMINAL LAW 662 (2d. Ed.1969)) (by the court), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979). The jury could reasonably credit Hill's testimony that appellant

sat on top of Mr. Gluckman and kicked him while he was being strangled. *See Langley v. United States*, 515 A.2d 729, 732 (D.C.1986). This evidence was sufficient to show that appellant intentionally engaged in conduct from which death was likely to occur as a probable consequence. Together with the ample evidence that Givens and Hill premeditated, a reasonable jury would reasonably find appellant guilty of aiding and abetting first-degree murder.[27] *See Prophet v. United States*, 602 A.2d 1087, 1092, 1095 (D.C.1992) (quoting *Waller v. United States*, 389 A.2d 801, 807 (D.C. 1978), *cert. denied*, 446 U.S. 901, 100 S.Ct. 1824, 64 L.Ed.2d 253 (1980)); *Marshall v. United States*, 623 A.2d 551 (D.C.1992) (Ferren J., concurring) (discussion of principal and accomplice liability); *Ingram v. United States*, 592 A.2d 992, 1001–002 (D.C.) (aider and abetter does not need identical intent of principal as long as principal's action was in some way foreseeable), *cert. denied*, —— U.S. ——, 112 S.Ct. 667, 116 L.Ed.2d 757 (1991).[28]

■ There was also sufficient evidence to support appellant's convictions for unauthorized use of Mr. Gluckman's car, the robbery of items from Mr. Gluckman's person and the burglary of and theft of items from his apartment. *See Beatty v. United States*, 544 A.2d 699, 701 (D.C.1988); *Shelton v. United States*, 505 A.2d 767, 769 (D.C.1986). In view of Hill's testimony

---

**27.** The use of the rope was sufficient to prove the "while armed" element of the charge since appellant's culpability arises from the assistance that he rendered to Givens, according to Hill. *Battle v. United States*, 515 A.2d 1120, 1128 (D.C. 1986) (unarmed aider and abettor subject to conviction for armed offense by principal); *Powell v. United States*, 485 A.2d 596, 601 (D.C. 1984) ("instrument capable of producing death or serious bodily injury by its manner of use qualifies as a dangerous weapon"; car found to be a dangerous weapon), *cert. denied*, 474 U.S. 981, 106 S.Ct. 420, 88 L.Ed.2d 339 (1985).

**28.** Appellant also contends in his § 23–110 motion that his trial counsel was ineffective for failing to argue that the evidence was insufficient because he was intoxicated the night of the murder and lacked the necessary intent. At the motions hearing, appellant testified that PCP makes him "incoherent" in the way he thinks. *See Hopt v. Utah*, 104 U.S. 631, 633–34, 26 L.Ed.

873 (1881) (when premeditation is required, "the question, whether the accused is in such a condition of mind, by reason of drunkenness or otherwise, as to be capable of deliberate premeditation, necessarily becomes a material subject of consideration by the jury"); *see also Womack v. United States*, 119 U.S.App.D.C. 40, 336 F.2d 959 (1964) (intoxication as defense to specific intent crime). The motions judge did not rule expressly on this issue, but we are satisfied that the jury could actually find that appellant was capable of forming the necessary intent. *Cf. Carter v. United States*, 531 A.2d 956, 961 (D.C.1987) (intoxication); *Heideman v. United States*, 104 U.S.App.D.C. 128, 131, 259 F.2d 943, 946 (1958) (same; evidentiary groundwork must be adequately laid), *cert. denied*, 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed.2d 767 (1959); *see also Durant v. United States*, 551 A.2d 1318, 1325 (D.C.1988) (PCP intoxication).

that appellant joined Givens and Hill in the car, there was evidence from which a reasonable jury could find that appellant knew, or should have known, that the owner of the car had not given permission to Hill and Givens to drive the car. A man was bound and gagged and begging for help. Appellant helped to subdue him. Personal property belonging to the victim—his driver's license, something presumably taken out of his wallet during the robbery—was later displayed by appellant to one of the government's witnesses. Hill also testified that appellant went into Mr. Gluckman's home and returned carrying two plastic bags of personal property belonging to the victim.

B. *Closing argument.* Because there was no objection during the trial, our review is for plain error, *see Coreas v. United States,* 565 A.2d 594, 600 (D.C.1989), *cert. denied,* —— U.S. ——, 112 S.Ct. 167, 116 L.Ed.2d 130 (1991) (citation omitted), and we find none.

 Appellant's contentions that the prosecutor inflamed the jury, made statements of personal belief and distorted the evidence simply do not rise to the level of plain error. For example, two alleged misstatements by the prosecutor, that appellant views as deliberate distortions, cannot be said to have jeopardized the fairness of the trial.[29] The trial judge's failure, *sua sponte,* to intervene when the prosecutor stated that:

> Arthur Gluckman was a real human being who was murdered by these people. When you go back, don't sit there and try to find reasons not to find Leon Matthews guilty of these crimes because he is guilty,

did not, as appellant suggests, constitute plain error as an attempt to shift the burden of proof. The context of these statements cannot be ignored. The prosecutor went on to say:

> And we ask you, ladies and gentlemen, when you sit in that jury room and you begin your deliberations, that you please sit there and review the evidence in its entirety. And we do submit to you that if you do, there is but one conclusion, and that conclusion is that Leon Matthews is guilty beyond a reasonable doubt.

In addition, the judge's failure to intervene when the prosecutor said:

> Arthur Gluckman was not just murdered, Leon Matthews and his friends had fun getting high and torturing him, [and that appellant thought the whole thing] was a joke

does not rise to the level of plain error. *See, e.g., Irick v. United States,* 565 A.2d 26, 36 (D.C.1989) (prosecutor is not required to sanitize the evidence in arguing the government's case to the jury).

 C. *Merger.* Appellant's contentions that his convictions for unauthorized use of a vehicle merge with his robbery conviction, and that his theft conviction merges with his burglary conviction are meritless. *See Byrd v. United States,* 598 A.2d 386 (D.C.1991) (en banc). Each conviction required a different element of proof.[30]

---

**29.** In one instance the prosecutor was describing appellant's entry into the car:

> One of them tells him, it's just some nigger laying back there. Come on we're going to burglarize his house. You want to go? Yes. *What does he tell you?* Yes, I want to go. What does he then do? He opened that car door....

The government contends that the italicized phrase should have been "what does he tell them?" Given the context of the phrase, there was no plain error.

The second alleged misstatement occurred when the prosecutor was describing how Mr. Gluckman was killed:

> He [appellant] sits in this courtroom today and you've seen him. He added the weight of his body to prevent Arthur Gluckman from moving. And, after one of his buddies, Givens, pulls that rope, it's not enough. *He then puts the rope* around the headrest.

Appellant contends that the prosecutor was accusing him of pulling the rope. Taking the phrase in context, "he" could reasonably have referred to Givens, and this less sinister inference is consistent with the prosecutor's overall argument. Based on the evidence that was before the jury, we find no plain error.

**30.** Appellant also contends that the motions judge abused his discretion in denying appellant's motion to reduce sentence under Super.Ct.Crim.R. 35. Consistent with our limited scope of review, we find no abuse of discretion.

## V.

Finally, appellant contends that the motions judge erred in denying his motion for a new trial on the basis of alleged *Brady* [31] violations and newly discovered evidence.

### A.

In his post-trial motions appellant argued that the government had withheld exculpatory information told to the police by Hill and Givens. Appellant maintained that the information was "clearly" *Brady* material under *United States v. Bagley*, 473 U.S. 667, 680, 105 S.Ct. 3375, 3382–83, 87 L.Ed.2d 481 (1985). On appeal our review is limited to the question of whether the motions judge's view that the alleged *Brady* material would not have materially affected the verdict was reasonable. *Derrington v. United States*, 488 A.2d 1314, 1339 (D.C.1985), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988).

██ Appellant contends that the government failed to disclose a statement by Dale Givens to the police and prosecutor, that was partially taped, in which Givens said that appellant had not kicked Mr. Gluckman or participated in his murder since Mr. Gluckman was already dead when appellant got into the car, and that he (Givens) would not testify against appellant at trial since he had nothing to do with the murder. This contention is based on the

handwritten notes of Detective Kilcullen taken during an interview with Dale Givens. The notes stated: "Leon not do anything just there willingly and help in burglary, not assist in murder, not stop murder." The motions judge found that Detective Kilcullen's notes of a December 17, 1984, interview with Givens did not constitute *Brady* material, being too vague and inculpatory in fact, since the notes implicated appellant in the burglary and also placed appellant "at the scene of the murder, and implied that, although he took no part in the murder, [appellant] was aware of what was going on and did not stop the strangulation." Moreover, the judge credited the testimony of the trial prosecutor that he had explained to appellant exactly what the statement said.

The detective's notes were partially exculpatory insofar as they indicated that, although appellant was present and did not stop Hill and Givens from committing the murder, his only direct involvement was in the burglary. *Cf. Agurs, supra* note 23, 427 U.S. at 108, 96 S.Ct. at 2399–2400 ("because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure"). The notes did not indicate that appellant was in the car at the time of the murder. Instead, the notes were consistent with appellant's motions testimony, and Sylvester Givens' trial

---

See *Walden v. United States*, 366 A.2d 1075, 1077 (D.C.1976) (motion for reduction of sentence is "basically 'a plea for leniency'" and "[b]asically, an appellate court may not substitute its judgment for that of the trial court, even if the prisoner presents 'an affecting case for reconsideration of the sentence'") (quoting *Poole v. United States*, 102 U.S.App.D.C. 71, 76, 250 F.2d 396, 341 (1957), and *United States v. Krueger*, 454 F.2d 1154, 1155 (9th Cir.1972), respectively).

Appellant sought to be committed under the Federal Youth Corrections Act. He submitted an evaluation by a psychologist, who concluded that appellant would benefit from such a commitment. He also presented evidence tending to show that the District of Columbia's juvenile detention facilities were ineffective in rehabilitating young offenders, and he contested the no-benefit conclusion of the classification committee. The motions judge found no error in the trial judge's conclusion that appellant would not benefit from Youth Act commitment. Contrary

to appellant's contention, the motions judge did not ignore the new information "that [appellant] was not a sociopath, that even the classification committee professionals found that appellant could benefit from rehabilitation, that appellant, merely a sixteen year old boy, had not received true past rehabilitation, that he did not have a history of violent crime ... and that appellant had been in virtual isolation, during the time that he met with the classification committee, without any communication from his trial counsel." The motions judge based his decision on the pleadings, the prior record and the new psychological assessment of appellant, and even summarized appellant's arguments in his decision.

**31.** *Brady v. Maryland, supra* note 1, 373 U.S. 83, 83 S.Ct. 1194, requires that on request, the government must disclose exculpatory evidence.

testimony, that appellant was in the parking lot where the murder took place and merely close enough to hear Mr. Gluckman's cries for help. Given the disparity between appellant's age and the ages of Hill and Givens, as well as the partnership in crime in which Hill and Givens had previously engaged, *see* note 4, *supra*, the detective's notes were of potential value to appellant. However, the government established at the post-trial hearing that the prosecutor disclosed the substance of Dale Givens' statements to appellant and his trial counsel prior to trial. This testimony was uncontradicted. Hence, there is no basis to conclude that the government improperly withheld the statement, or that appellant was significantly prejudiced.

 Appellant also contends that Hill's pretrial statements were *Brady* material. As to most of the statements, a claim of a *Brady* violation cannot prevail under *Catlett v. United States*, 545 A.2d 1202, 1217 (D.C.1988), *cert. denied*, 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989). The written statement, the statement to the grand jury, and the videotape were all turned over to appellant prior to Hill's cross-examination, and Hill was recalled to the witness stand after trial counsel had an opportunity to see the videotape. The record indicates that trial counsel, in fact, used the statements to impeach Hill at trial.[32]

 As to the transcript of Hill's plea hearing, the government maintains that it has no duty to turn over information to which the defense has access and of which it is aware. It relies on *Henson v. United States*, 399 A.2d 16, 18 n. 3 (D.C.), *cert. denied*, 444 U.S. 848, 100 S.Ct. 96, 62 L.Ed.2d 62 (1979), where the court rejected the argument that the government had withheld *Brady* information in the form of

testimony before the Parole Board where defense counsel and the defendant had been present at the Parole Board proceeding and therefore, "were fully aware of the existence and the contents" of the sought information. *Id.* at 19. Indeed, the court noted that the record indicated that a transcript of the Parole Board proceeding was produced and the defendant saw it. *Id.* at 18 n. 3. This case is not identical to *Henson*, for appellant and his counsel were not present at Hill's plea hearing; nor does the record show that they were aware of it.[33] But, assuming without deciding that the government should have produced the transcript as *Brady* material, Hill's description of the crimes made it clear that a third person was not involved. The plea transcript alone was not material under *Bagley*, *supra*, 473 U.S. at 680, 105 S.Ct. at 3382–83, since the defense was already aware that Hill had previously stated that the murder took place after the burglary.

 Appellant also contends that the government should have turned over a statement from Darryl Givens, another brother of Dale Givens, that, according to Detective Kilcullen's notes, Dale Givens had told Irene Givens, who had told Darryl Givens, that appellant was not really involved in the murder. While appellant maintains that this was clearly a favorable statement for him, the statement was, as the motions judge found, double hearsay, vague, and unlikely by itself to have a significant effect on the result of the trial. At best, as the government argues, the statement might have been traced back to Irene Givens, and, had she testified, then the statement would have been admissible only for impeachment of Dale Givens, had he testified for the government and adversely to appellant. *See Henson, supra,*

---

**32.** But, the trial judge commented that the normal procedure was for the government to allow defense counsel to view a videotape in advance of trial so that the trial would not have to be delayed while defense counsel had an opportunity to view the videotape. Had this been done, trial counsel might have been better able to cross-examine Hill, because counsel would have had additional time to prepare. *Compare*

*James, supra* note 23, 580 A.2d at 643 *with Frezzell, supra* note 23, 380 A.2d at 1385.

**33.** The record does not indicate, however, that there was any apparent obstacle preventing appellant's counsel from keeping track of Hill's case and from ordering a transcript of his plea hearing.

399 A.2d at 19–20 (statement against penal interest).

We also find no merit to appellant's other *Brady* contentions. Appellant's claim that the government failed to disclose promises or assurances made to Hill in exchange for his testimony was rejected by the motions judge on the basis that the trial prosecutor had testified that he had made no promises to Hill. *See Williams v. United States,* 595 A.2d 1003, 1006 (D.C.1991) (this court defers to trial court determination of credibility of witnesses). Actually, the prosecutor testified that, while he made no promises, he might have told Hill, that if there was a need, he would tell the court about Hill's cooperation at appellant's trial. But, even so, Hill's testimony was somewhat inconsistent on the matter, and in his affidavit recanting his trial testimony, Hill admitted that the prosecutor had made no promises to him. Although Hill claimed that he retained some hope that the prosecutor might speak in support of a reduction of Hill's sentences, hopes are not promises, and in this sense there was nothing for the government to disclose.

■ Appellant can fare no better in his contention that the government made knowing use of testimony by Hill that appellant describes as perjurious. Appellant maintains that the government must have known that Hill's trial testimony implicating appellant was false because Hill's previous statements were inconsistent with it, and because Dale Givens and Darryl Givens had said that appellant was not present during the murder. This is insufficient to show that the prosecutor had "a concrete, reliable basis for disbelieving [Hill's] version." *Hawthorne v. United States,* 504 A.2d 580, 590 (D.C.1986) ("[b]ecause no representative of the government was present at the crime and because all the government witnesses were impeachable in one way or another, the prosecutor did not have a concrete, reliable basis for disbeliev-

ing [the witness'] version of his own involvement; at most, [the prosecutor] could believe, especially by reference to the plea bargain, that [the witness] was 'an accomplice whether he admits it or not' (as [the prosecutor] told the court during a bench conference)"), *cert. denied,* 479 U.S. 992, 107 S.Ct. 593, 93 L.Ed.2d 594 (1986). Only Hill and Givens, and perhaps to a lesser extent appellant, knew what had happened to Mr. Gluckman on January 6, 1984. It would not have been unreasonable for the prosecutor to think that Givens was trying to protect appellant because they were close friends, but Hill, by contrast, not being a close friend of appellant's, might understand, as time passed, the importance of his testifying fully about appellant's involvement. "Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony." *Tapia v. Tansy,* 926 F.2d 1554, 1563 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 115, 116 L.Ed.2d 84 (1991) (citations omitted).

Accordingly, the motions judge's ruling that the alleged *Brady* material would not have materially affected the verdict was not unreasonable. *Derrington, supra,* 488 A.2d at 1339.

### B.

■ Nor can appellant show that the motions judge abused his discretion in denying appellant's motion for a new trial on the basis that the exculpatory statements of Dale Givens and Darryl Givens constituted newly discovered evidence requiring a new trial. *See Joseph v. United States,* 597 A.2d 14, 23 (D.C.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1988, 118 L.Ed.2d 585 (1992);[34] *Heard v. United States,* 245 A.2d 125, 126 (D.C.1968). The motions judge could reasonably find that

---

**34.** In order to grant a new trial based on new evidence:

(1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3)

the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal.

*Id.*

Dale Givens' statement was not newly discovered, for appellant admitted at the motions hearing that he had known before trial that Dale Givens could exculpate him. *See Townsend v. United States,* 549 A.2d 724, 726 (D.C.1988) (trial court findings "reasonable and supported by evidence in the record"), *cert. denied,* 490 U.S. 1102, 109 S.Ct. 2457, 104 L.Ed.2d 1011 (1989). Further, treating the statement as newly discovered evidence, the motions judge discredited the statement because of Givens' demeanor and its refutation by other sources, both testimonial and documentary. Nor did the judge err in concluding that, viewed alone, Darryl Givens' vague and double-hearsay statement did not constitute newly discovered evidence likely to affect the verdict.

The motions judge discredited Hill's recantation of his trial testimony and Hill's motions testimony for eleven stated reasons.[35] At least some of these reasons are supported by the record, and, hence, we find no error. *See Derrington, supra,* 488 A.2d at 1339; *Godfrey v. United States,* 454 A.2d 293, 301 (D.C.1982); *United States v. Kearney,* 220 U.S. App.D.C. 379, 384, 682 F.2d 214, 219 (1982).

## VI.

■ Accordingly, we remand the record to the trial court to determine whether or not, viewed pretrial, appellant was denied the effective assistance of counsel because trial counsel's pretrial preparation was not "within the range of competence demanded of attorneys in criminal cases." *Nelson, supra* note 16, 601 A.2d at 592 (quoting *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970)). Upon such remand, the government bears the burden of persuasion. *See id.* (placing the burden of persuasion on the government at the remand hearing "serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision") (quoting *Addington v. Texas, supra,* 441 U.S. at 423, 99 S.Ct. at 1808); *McFadden, supra* note 16, 614 A.2d at 17. If the trial court concludes, after a hearing, that, viewed pretrial, appellant's Sixth Amendment right to counsel was violated, it shall vacate the judgments of conviction and order a new trial. If the court concludes there was no such violation, then the trial court shall make findings of fact sufficient for appellate review in the event appellant elects to seek review. *See Fields, supra,* 466 A.2d at 824.

■ Further, if the trial court determines that appellant was not denied his pretrial right to the effective assistance of counsel, then the trial court shall hold a hearing on appellant's § 23–110 motion to determine whether or not he was denied the effective assistance of counsel. *See McFadden, supra* note 16, 614 A.2d at 14 (court will not reach post-trial complaint about ineffective assistance of trial counsel until addressing pre-trial claim). At this hearing, appellant bears the burden of persuasion, and if the court concludes that appellant was not denied his Sixth Amendment right to counsel, the trial court shall make findings of fact sufficient for appellate review. In view of the different bur-

---

**35.** The motions judge found that (1) Hill's trial testimony had been corroborated; (2) his grand jury testimony was consistent with his trial testimony; (3) he testified, unbelievably, that he could not remember who had strangled Mr. Gluckman; (4) his motions testimony that he had previously told the government all of this was refuted by the government witnesses, whose testimony the judge credited; (5) Hill's motions testimony that appellant was not present during the burglary was refuted by his prior testimony, the government witnesses and appellant himself; (6) the trial prosecutor's testimony that he made no promises to Hill in return for his testimony inculpating appellant was credible; (7) the testimony of the government wit-

nesses that Hill had never told them that his grand jury testimony was false was credible; (8) Hill's claim that Mr. Gluckman was dead before appellant entered the car was refuted by the trial prosecutor's testimony that Hill had previously told him the opposite; (9) the reasons that Hill gave for testifying falsely were unworthy of belief in view of the testimony by government witnesses that Hill was a cooperative witness; (10) Hill's claim that appellant was not present during the strangulation was refuted by Detective Corboy's testimony that appellant admitted to being present, which testimony the judge credited; and (11) "Hill's demeanor at the hearing and evasive answers convinced the Court he was lying."

dens, the *Monroe–Farrell* determination shall be completed before a hearing is held on the post-trial claim of ineffective assistance of counsel.